**L & H INVESTMENTS, LTD., t/a Lynn House, Plaintiff,**

v.

**BELVEY CORPORATION, a North Carolina Corporation, Belk Brothers Company, a North Carolina Corporation, and J. B. Ivey & Company, a North Carolina Corporation, Defendants.**

No. C-C-77-176.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 10, 1978.

W. Thomas Ray and Frank L. Bryant, Charlotte, N. C., for plaintiff.

Robert C. Sink, Fleming, Robinson & Bradshaw, P. A., Charlotte, N. C., for defendants.

## ORDER

McMILLAN, District Judge.

This case is before the court on defendants' motion to dismiss pursuant to Rule 12(b)(6). By order filed December 28, 1977, the court indicated it would grant the motion in part and deny it in part. The court now files this memorandum setting out the reasons for its ruling.

The complaint contains the following allegations, which for purposes of this motion are taken as true. From 1969 to 1974 plaintiff L & H Investments, Ltd., operating as Lynn House, conducted a retail women's clothing business in lease premises at SouthPark, a large shopping center in Charlotte, North Carolina. Defendant Belvey Corporation was the owner and lessor of store space in the center. The defendants Belk Brothers Company (Belk) and J. B. Ivey & Company (Ivey) are the joint owners of the Belvey Corporation and also the largest tenants in the shopping center. Both operate retail department stores at South-Park and sell, among other things, women's clothing.

In 1974 plaintiff wished to sell its business at SouthPark, but to do so it needed Belvey's consent to any assignment of its lease. Plaintiff located a prospective purchaser, Deb Shop Downtown, Inc., also a women's clothing merchant, and a contract for sale of the business was allegedly made. The sale was not completed, however, because plaintiff was unable to secure Belvey's consent to the proposed lease assignment. A second, unidentified, purchaser is also said to have slipped away when Belvey refused to modify certain conditions in the lease concerning store operating hours.

In September, 1974, plaintiff finally sold out to Belvey, who promptly leased the premises to Montaldo's, another women's clothing retailer. Plaintiff alleges that Belvey was willing to waive the operating hours requirements for Montaldo's but not for the other prospective purchaser. As a result of the "forced sale" to Belvey, plaintiff claims it realized $60,000 less on the sale of its business than it could have realized by selling to either of the other possible buyers.

The complaint sets out three claims:

(1) That the three defendants conspired to control competition at SouthPark by restricting the entry of new tenants into the shopping center, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1;

(2) That the three defendants engaged in unfair methods of competition or deceptive acts and practices, in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45; and

(3) That defendants Belk and Ivey tortiously interfered with plaintiff's contract with defendant Belvey and that all three defendants tortiously interfered with plaintiff's contract with Deb Shop Downtown, Inc.

## I.

Plaintiff has alleged that SouthPark draws customers from at least two states, that merchants in SouthPark advertise in at least two states and that the goods sold at SouthPark travel in interstate commerce. This is enough to withstand defendants' contention that the Sherman Act claim should be dismissed because of failure to allege a substantial effect on interstate commerce. *Hospital Building Company v. Trustees of the Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

More troublesome, however, is defendants' argument that plaintiff has not alleged an injury to its business or property "by reason of anything forbidden in the antitrust laws" as is required for maintaining an action under section 4 of the Clayton Act, 15 U.S.C. § 15.

The court has examined the concept of "standing" in private antitrust suits and has found no clear and single controlling principle. Appellate courts have applied a variety of tests to determine whether a plaintiff has suffered an injury cognizable under the antitrust laws. These tests include whether the injury is "direct" or "indirect," whether the plaintiff is within the "target area" of defendants' conduct, and whether the antitrust laws were intended to protect persons in the plaintiff's position. See generally, Sullivan, *Antitrust* § 227 (1977); Stickells, *Federal Control of Business: Antitrust Laws* § 187 (1972); Sherman, "Antitrust Standing: From *Loeb* to *Malamud*," 51 *N.Y.U.L.Rev.* 374 (1976); Lytle & Purdue, "Antitrust Target Area Under Section 4 of the Clayton Act: Determination of Standing in Light of the Alleged Antitrust Violation," 25 *Am.U.L.Rev.* 795 (1976). One court has even adopted the "zone of interests" standing test applied in judicial review of administrative actions. *Malamud v. Sinclair Oil Corp.,* 521 F.2d 1142 (6th Cir. 1975).

In the Fourth Circuit the only decided case on antitrust standing is *South Carolina Council of Milk Producers, Inc. v. Newton,* 360 F.2d 414 (4th Cir.), *cert. denied,* 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).

The court there held that raw milk producers whose profits were depressed when retailers combined to sell milk as a "loss leader" had suffered an injury giving them standing to sue the retailers for treble damages. Plaintiffs were said to be in the "target area," which the court defined thus:

"If a plaintiff can show himself within the sector of the economy in which the violation threatened a breakdown of competitive conditions and that he was proximately injured thereby, then he has standing to sue under section 4."

360 F.2d at 418. While employing the "target area" concept, the court did so with a heavy emphasis on notions of foreseeability and causation:

"The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury. If the damage was merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured 'by reason of anything forbidden in the antitrust laws' as contemplated by the Clayton Act."

360 F.2d at 419. In the court's view the combination among milk retailers threatened the economic health of the dairy industry generally; it was deemed immaterial that there was no privity or no direct competition among the parties. See also *Midway Enterprises, Inc. v. Petroleum Marketing Corp.,* 375 F.Supp. 1339 (D.Md.1974).

The *Newton* decision, however, must be read in light of the most recent Supreme Court pronouncement in *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The Court in *Brunswick* held that bowling centers who lost an opportunity to increase their share of business in several local markets when a large manufacturer of bowling equipment bought several failing centers and thereby kept them in the market could not sue for potential lost profits under the anti-merger provisions of the Clayton Act. On the question of standing the Court stated:

"Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause.' "

429 U.S. at 489, 97 S.Ct. at 697 (citation omitted). In so deciding, the Court rejected a test applied by the appellate court which required plaintiffs to show nothing more than a causal link between the violation and the injury. *NBO Industries Treadway Cos., Inc. v. Brunswick Corp.*, 523 F.2d 262, 273 (3rd Cir. 1975). Plaintiffs in *Brunswick* were injured by the revived vitality of certain competitors and not by any breakdown of competitive conditions resulting from the merger. As the Court noted, their injury was unrelated to the size of the "deep pocket" acquiring company and would have occurred had there been a merger with a "shallow pocket" parent company or had the failing bowling centers obtained independent refinancing of their businesses. 429 U.S. at 487, 97 S.Ct. at 697.

After *Brunswick* it is apparently not enough that plaintiff stand somewhere in the threatened sector of the economy; he must also show that his injury is logically related to the violation. The emphasis is shifted from proximate causation to an analysis of the *type* of antitrust violation alleged and the anticompetitive effects it is thought likely to produce. See also *GAF Corp. v. Circle Floor Co., Inc.*, 463 F.2d 752, 758 (2d Cir. 1972), *cert. dismissed*, 413 U.S. 901, 93 S.Ct. 3058, 37 L.Ed.2d 1045 (1973); *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971).

The allegations in this case are that defendants Belk and Ivey, working through defendant Belvey, used their control over the leasing of store space at SouthPark to determine who would compete with them and on what terms. Assuming that such a conspiracy existed, it is not of a type readily brought within any of the traditional categories of antitrust violations. One of the alleged goals of the scheme was to control price competition by selecting and approving tenants according to the quality of merchandise they would offer relative to that available in defendants' own stores. Yet the alleged scheme is not a classic price-fixing conspiracy; it operated primarily by restricting the entry of new competitors into the market, such as is frequently involved in cases of monopolization or illegal mergers. Alternatively, the alleged conspiracy could be said to "foreclose" access to store space in much the same way as a vertical merger between manufacturer and supplier may foreclose access to the supplier by competitors of the manufacturer.

Whatever the label put on the alleged violation, the two groups most likely to be injured by defendants' activities would be persons who shop at SouthPark and existing or potential competitors of the defendants Belk and Ivey. Plaintiff does not obviously fall into either of these groups. Although it had sold women's clothing at SouthPark, its claimed injury did not result from its status as a seller of *goods* but from its status as seller of a *business*. There is no allegation that the initial decision to sell out was made because of any anticompetitive practices engaged in by defendants.

■ The court is of the opinion, however, that plaintiff has alleged an injury which may reasonably be said to reflect the anticompetitive effect of the alleged violation. Assuming for now that the appropriate market definition encompasses only the retail trade at SouthPark, any restrictions on entry into that market necessarily result in impacts on existing competitors seeking to leave the market. There is no new entry without a corresponding exit. More importantly, however, the type of injury plaintiff claims can be directly related to the effects of restricted entry. One of the considerations affecting market entry is the ability to liquidate an investment in fixtures and stock and leave the market if competitive conditions require it. If investments made

by competitors are subject to *liquidation* only with the approval of the defendants, then it can be said that *entry* into the market is rendered less desirable and more difficult. The competitors of Belk and Ivey would thus suffer a disability not shared by the two large retail stores and one directly resulting from defendants' control over market entry.

Although the issue is not wholly free from doubt, the court concludes that plaintiff has sufficient standing to survive the motion to dismiss the Sherman Act claim. Moreover, plaintiff, while perhaps not the principal victim of the alleged violation, may be able to provide more vigorous enforcement of the antitrust laws than would retail customers, whose individual stakes were be small, or foreclosed competitors, whose damages may be too speculative to support litigation. *Cf., Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

## II.

■ As defendant rightly points out, and as plaintiff now concedes, there is no private right of action for violations of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. *Nashville Milk Co. v. Carnation Co.*, 335 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 340 (1958); *Alfred Dunhill v. Interstate Cigar Co.*, 499 F.2d 232 (2nd Cir. 1974); *Holloway v. Bristol-Myers Corp.*, 158 U.S.App.D.C. 207, 485 F.2d 986 (1973). Plaintiff's second claim will therefore be dismissed.

## III.

■ Plaintiff's third claim includes two separate allegations: (1) that Belk and Ivey tortiously interfered with the lease arrangement between plaintiff and Belvey, and (2) that all three defendants tortiously interfered with a contract between plaintiff and Deb Shop Downtown, Inc. The initial problem presented by defendants' motion is this: if plaintiff had no contractual right to obtain Belvey's consent to an assignment of the lease it is difficult to see how Belk and Ivey could have tortiously interfered with

anything. Likewise, there would not seem to be a *tortious* interference with any contract between plaintiff and Deb Shop if Belvey acted within its rights under the lease in withholding consent to the proposed assignment.

Plaintiff's lease did not contain an absolute prohibition against assignment but instead permitted assignment upon written consent of the lessor. In North Carolina the law concerning such consent clauses has long been silent. Recently, however, it has been held that consent arbitrarily withheld is invalid and that a landlord's refusal to give consent to an assignment should be based on reasons related to the purposes for which the tenancy was created. *Sanders v. Tropicana*, 31 N.C.App. 276, 229 S.E.2d 304 (1976). Since the reasonableness of Belvey's refusal to consent to the proposed lease assignment involves a question of fact, dismissal of the third claim on the ground that there was no contractual right to obtain the consent is not appropriate.

■ As an additional argument defendants point out that the law of North Carolina requires a tortfeasor to be an "outsider" to the contract, and that as to the first part of the claim for tortious interference defendants Belk and Ivey are not "outsiders" to any of Belvey's contracts. North Carolina law does recognize that shareholders and directors are not ordinarily to be considered "outsiders" to contracts between a corporation and third parties. Their privilege to interfere with the corporation's contracts is, however, only a qualified one. Shareholders and directors may not "employ any improper means and . . . [must have] acted in good faith to protect the interests of the corporation." *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964). Again, since the question of "good faith" is one of fact, plaintiff's claim for tortious interference by Belk and Ivey cannot be resolved on the motion to dismiss.

■ Finally, defendants contend that the third claim should be dismissed since, as to the contract between plaintiff and Deb Shop, it fails to allege that defendants "in-

tentionally induced the third person not to perform his contract with the plaintiff." *Childress v. Abeles*, 240 N.C. 667, 674, 84 S.E.2d 176, 181 (1954). The complaint does not say that there was any attempt by defendants to persuade Deb Shop to abandon its contract with plaintiff. However, the *manner* of a tortious interference has never been so narrowly defined as the quoted language may suggest. As Prosser notes:

> "There are . . . situations in which the action has been allowed where the defendant has merely prevented the performance of a contract, or has made the performance more difficult and onerous. . . . The action has been allowed where it is the plaintiff himself who has been prevented from performing the contract, and so obtaining its benefits, by threats or exclusion from the premises, or even by inducing him to break the contract himself."

*Prosser on Torts* § 123 (3d ed. 1964); *cf., Walker v. Nicholson*, 257 N.C. 744, 127 S.E.2d 564 (1962). Plaintiff has alleged that there was a contract to sell its business and assign its lease to Deb Shop; that defendants wrongfully acted to prevent the lease assignment; and that as a result of their conduct the sale and assignment to Deb Shop could not be completed. If these facts are proved, plaintiff will have made out a claim of tortious interference.

For all the reasons stated above IT IS THEREFORE ORDERED:

1. That defendants' motion to dismiss the first and third claims is denied, and

2. That defendants' motion to dismiss the second claim is allowed.