921 F.2d 1343
 DAVIDSON & JONES DEVELOPMENT COMPANY, Plaintiff-Appellee
(89-5945/6031),
v.
ELMORE DEVELOPMENT CO., INC., et al., Defendants-Appellants
(89-5945), Manna Construction Co., Inc.,
Intervenor-Appellant (89-6031).
 Nos. 89-5945, 89-6031.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 5, 1990.
Decided Jan. 3, 1991.
 
 1
 Monty L. Walton, Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, Tenn., Luther P. Cochran, Griffin, Cochrane, Marshall & Elger, W. Henry Parkman (argued), Atlanta, Ga., for plaintiff-appellee.
 
 
 2
 Charles W. McElroy (argued), David K. Taylor, Boult, Cummings, Conners & Berry, Nashville, Tenn., Robert L. Wilson, Jr., Thaddeus B. Hodgdon, Hollowell & Silverstein, Raleigh, N.C., for defendants-appellants.
 
 
 3
 Stephen J. Lusk, Carl W. Eshbaugh (argued), Eshbaugh, Simpson & Varner, Knoxville, Tenn., for intervenor-appellant.
 
 
 4
 Before MARTIN and GUY, Circuit Judges; and DOWD,* District Judge.
 
 DOWD, District Judge:
 
 5
 This case involves the claims and counterclaims of several parties interested in developing an outlet mall near the Great Smoky Mountains in Pigeon Forge, Tennessee. Plaintiff/counterdefendant Davidson & Jones Development Company ("D & J") withdrew from an agreement whereby D & J would take title to the proposed outlet mall property and acquire the rights to develop the proposed mall after D & J claimed that conditions precedent to its participation in the project were unfulfilled. Defendants/counterplaintiffs, Elmore Development Co. ("EDC") and MWC Properties, Inc. ("MWC"), counterplaintiff Pigeon Forge Outlet Mall, Inc. ("PFOM"), and intervenor, Manna Construction Company, Inc. ("Manna"), appeal from the district court's grant of summary judgment in favor of D & J in this diversity contract action. For the reasons that follow, we vacate the grant of summary judgment as to EDC's and MWC's breach of contract claims and remand those claims to the district court. In all other respects, we affirm the district court's grant of summary judgment to D & J.
 
 HISTORY OF THE PROCEEDINGS
 
 6
 D & J originally filed this suit in North Carolina state court in October 1987, as a declaratory judgment action against EDC and MWC. D & J sought a declaration of nonliability under a contract (the Assignment Agreement) between D & J, EDC and MWC. Following removal to federal district court in North Carolina on the basis of diversity of citizenship, the case was transferred to the Eastern District of Tennessee, pursuant to 28 U.S.C. Sec. 1404(a).
 
 
 7
 EDC and MWC filed counterclaims, asserting that D & J was liable for breach of the Assignment Agreement, and EDC further claimed that D & J tortiously interfered with EDC's separate contract to purchase the real estate for the proposed development. PFOM joined the action as an additional counterclaimant, asserting that it was a third-party beneficiary under the contract with D & J, and alleging tortious interference with its performance of contracts between it and third parties. Manna's motion to intervene as an additional counterplaintiff was granted. Manna asserted a counterclaim against D & J as a third-party beneficiary, and a counterclaim for tortious interference with Manna's contract with PFOM.
 
 
 8
 D & J moved for summary judgment in its favor on all claims, including its original declaratory judgment action. The district court granted D & J's motion and dismissed the case in its entirety. The timely appeals of EDC, MWC, PFOM and Manna were consolidated.
 
 STATEMENT OF FACTS
 A. General Background.[1]
 
 9
 In January 1987, EDC, a Mississippi corporation, obtained a right of first refusal to purchase 6.7 acres of real property in Pigeon Forge, Tennessee from the landowner in bankruptcy, Bent Creek, Inc. ("Bent Creek"). The property is located near the Great Smoky Mountains National Park, a substantial tourist market. EDC intended to develop a retail outlet mall on the property. Lee Larson Elmore ("Elmore") is the president of EDC. PFOM and MWC are Tennessee corporations formed by Elmore for the purpose of participating in the outlet mall development. Although the record does not disclose the extent of Elmore's control over these corporations, for the sake of convenience we will refer to them collectively as "Elmore's companies."
 
 
 10
 Representatives from Elmore's companies began to negotiate with other entities to bring the retail outlet mall project to fruition. PFOM entered into a construction manager's agreement with Manna in March 1987. In April, EDC entered into an architect's contract with Guthrey & Hart, Inc. ("Guthrey"). Elmore, on behalf of his companies, contacted a prospective anchor tenant, Carolina Pottery, Inc. and also retained First Southern Mortgage Company ("First Southern") to help locate persons or entities to provide additional financial backing.
 
 
 11
 B. D & J's early involvement.
 
 
 12
 First Southern first contacted D & J about the Pigeon Forge project in April 1987. Discussions centered around the possible formation of a joint venture between D & J and one or more of Elmore's affiliated companies. In May 1987, D & J's management approved the concept of entering into a joint venture with Elmore's companies. This approval was communicated to First Southern by letter dated May 22, 1987. On May 27, First American Bank in Knoxville ("FAB") contacted D & J to express its interest in making a loan to finance the project. John Cantrell ("Cantrell"), the bank's Senior Vice President for the real estate division, specified in a letter to both Bill Hicks ("Hicks"), Vice President of D & J, and Julian Peebles ("Peebles"), Senior Vice President of D & J, that the loan would have to be guaranteed by Elmore personally and by D & J corporately.
 
 
 13
 Shortly thereafter, D & J began direct discussions with Manna, and D & J reviewed copies of the architect's and construction manager's contracts. In mid-June, new contracts were executed between Manna and PFOM and between Guthrey and PFOM, using new forms as requested by D & J.
 
 
 14
 By the beginning of June 1987, D & J, through Hicks, began to negotiate directly with Carolina Pottery. By mid-June, D & J and Carolina Pottery reached agreement on the terms of a lease, which was to be executed by Carolina Pottery of Pigeon Forge, Inc., a corporation to be formed for the purpose of entering into the outlet mall development project. The terms of the lease included a $1 million inducement fee to be paid to Carolina Pottery.
 
 
 15
 On June 10, EDC's right of first refusal was replaced with an agreement for purchase and sale of the property. EDC agreed to pay $1,800,000 to the property's owner, Bent Creek, subject to the bankruptcy court's approval. The closing deadline was specified as July 1, 1987, or 30 days following the approval of the sale by the bankruptcy court, whichever was later. The sale was approved by the bankruptcy court on July 2, and a closing date was set for August 2.
 
 
 16
 On June 18, 1987, D & J's Chief Financial Officer, Gary Paul Kane ("Kane"), sent to Cantrell corporate financial statements of D & J, as well as the personal financial statements of D & J's principals, Robert L. Jones ("Jones") and Keith Harrod ("Harrod"). Joe Madron ("Madron"), a Vice President of FAB, stated in his deposition and in an affidavit that he discussed the proposed loan with Kane and informed Kane that FAB would require personal guaranties from Jones and Harrod. Kane stated in an affidavit that he does not recall these discussions, and that he was aware that Jones and Harrod generally were reluctant to give personal guaranties. Kane was not authorized to issue loan commitments without the approval of Jones and Harrod.
 
 
 17
 In early July 1987, D & J informed Elmore that it was no longer interested in entering into a joint venture for the development of Pigeon Forge Outlet Mall. Despite efforts to do so, Elmore was unable to find a financial backer to replace D & J and Bent Creek refused to close any later than August 2 without the payment of a substantial sum of money.
 
 
 18
 C. The Assignment Agreement.
 
 
 19
 In early August, Elmore, on behalf of EDC, negotiated with Bent Creek for the extension of the closing deadline, with the consideration furnished by an irrevocable letter of credit in the amount of $100,000 to be paid by EDC. EDC and Bent Creek entered into a second amendment to the purchase agreement,[2] which contained a September 18, 1987 deadline and provided that Bent Creek would call upon the letter of credit and the purchase agreement would expire on that date unless EDC provided the sellers with written notice of its intent to close within 30 days, accompanied either by a letter acceptable to the buyer, committing a lending institution to make the necessary construction and acquisition loan for the project, or by an additional $50,000 payment to Bent Creek.
 
 
 20
 D & J and Elmore's companies reopened negotiations in early August. On August 17, 1987, D & J, EDC and MWC entered into the Assignment Agreement that is the subject of this litigation. This agreement provided that D & J would take title to the property and acquire development rights to the project. To acquire these rights, D & J agreed to pay MWC $2 million for the property,[3] a $200,000 developer's fee to EDC, plus $2 per square foot for leases other than Carolina Pottery that had been obtained as a result of Elmore's prior efforts on behalf of his companies.
 
 
 21
 The Assignment Agreement included three conditions precedent to D & J's obligation to pay the above sums, and questions concerning those conditions is the central feature of this litigation. These conditions were as follows:
 
 
 22
 1. Fee: Subject to the following conditions precedent, each of which is independently material, D & J promises to pay Elmore [EDC] a fee of $200,000.00 in the manner hereinafter set forth. The conditions precedent are the following: (a) Subject to the provisions of Paragraph 6 the delivery to D & J of an acceptable executed lease with Carolina Pottery for space in the Project; (b) D & J having taken title to the property described in Exhibit A, title to be of quality and nature acceptable to D & J, and (c) D & J having obtained on terms agreeable to it a combination construction and acquisition loan in an amount sufficient to cover costs of the property and anticipated costs of construction of the Project.
 
 Appendix ("App."), at 11.[4]
 
 23
 The Assignment Agreement establishes two dates critical to its completion: the "Commitment Date" and the "Closing Date." The deadline for the Commitment Date was September 17, 1987 and D & J agreed to use its "best efforts" to obtain a binding loan commitment for a combined acquisition and construction loan commitment by that date. If D & J obtained the loan commitment, and the other conditions precedent were met, the parties agreed to close on the loan and simultaneously go forward with the purchase of the property on the Closing Date, which the agreement defined as being within twenty-five days of the date the loan commitment was issued. Except with respect to obtaining the loan commitment, no specific deadlines were set forth in connection with the fulfillment of the conditions.[5]
 
 
 24
 Paragraph 4 of the Agreement also stated the following with respect to the construction manager's and architect's contracts:
 
 
 25
 4. Contractor's and Architect's Contracts: D & J hereby agrees to enter into negotiations with the intent to enter into a construction management contract on the Project with Manna Construction Inc. and enter into negotiations with the intent to enter into an architect's contract with Guthrie & Hurt, Inc., [sic] both to be upon terms and conditions substantially similar to those previously negotiated by Elmore [EDC], and on terms reasonably satisfactory to D & J.
 
 
 26
 App., at 14-15.
 
 
 27
 The Assignment Agreement was to be "binding upon the parties hereto and their successors and assigns. This Agreement shall not be changed orally but may be changed only by a written agreement signed by Elmore [EDC] and D & J." App., at 16. In addition, the agreement contained a choice-of-law provision that specified that Tennessee law would govern the contract. Finally, the Agreement included an integration clause which stated that the Assignment Agreement was the entire understanding among the parties. App., at 18.
 
 
 28
 D. Events following the execution of the Assignment Agreement.
 
 
 29
 1. Financing.
 
 
 30
 After the Assignment Agreement was executed, D & J began to seek financing for the project. The developer contacted two lenders, one in North Carolina and FAB. FAB was the only lender interested in financing the project. Kane, D & J's chief representative in these negotiations, and FAB reached agreement on most of the terms of the loan by mid-September 1987. On September 15, FAB furnished a letter to D & J confirming its commitment and setting forth the major terms of the loan. The September 15 letter included the requirement that Jones and Harrod, principal shareholders of D & J, provide personal guaranties of repayment of the loan. According to Madron, FAB's Vice President, Kane said the letter as sent was satisfactory. FAB sent a letter rather than a loan commitment agreement at the request of D & J. D & J never requested that FAB prepare a formal loan commitment agreement.
 
 
 31
 2. The Carolina Pottery lease.
 
 
 32
 During the earlier joint venture phase, Hicks, on behalf of D & J, negotiated a tentative lease between D & J and Carolina Pottery. After D & J signed the Assignment Agreement, Hicks resumed negotiations with Carolina Pottery. On September 14, 1987, Dixon Fleming, Jr. ("Fleming"), of Carolina Pottery signed a lease presented to him by Hicks. According to Fleming, D & J voiced no opposition to the terms of the lease. App., at 503. Hicks took the lease form to D & J's offices, where it was signed by Peebles and Hicks. Hicks did not have the authority to bind D & J. Peebles testified at his deposition that he signed the lease because he was going to be out of town on September 17, 1987, the day D & J's executive committee would meet to discuss the Pigeon Forge project.[6]
 
 
 33
 3. D & J's September 17 meeting.
 
 
 34
 On September 17, D & J's executive committee held a meeting to discuss the Pigeon Forge Outlet Mall project. At this meeting, the committee reviewed the FAB loan proposal and the Carolina Pottery lease. D & J determined that the letter from FAB was not a binding commitment and that the requirement that Jones and Harrod personally guarantee the loan was unacceptable, particularly because the principals of Carolina Pottery were not providing personal guaranties of the proposed anchor tenant lease. That same day, D & J contacted Carolina Pottery to propose that the inducement fee be reduced to $500,000, from $1,000,000 and that personal guaranties be provided. Carolina Pottery rejected this proposal and the lease was never consummated.
 
 
 35
 After D & J determined that the conditions precedent to the Assignment Agreement had not been fulfilled, D & J decided not to go forward with the contract.[7] Although D & J immediately notified Elmore's companies of its decision, EDC was unable to meet the September 18 deadline to maintain its right to purchase the property. Bent Creek called upon the $100,000 letter of credit previously furnished by EDC as consideration for the extension of the closing deadline.
 
 
 36
 4. Events after September 18.
 
 
 37
 After EDC failed to secure the necessary financing to purchase the property, Bent Creek attempted to find another buyer for the property. In the course of its attempts to do so, Bent Creek asked D & J whether D & J would consider purchasing the property without the involvement of Elmore's companies. D & J responded that it remained interested in the property and the outlet mall project, but that it would require a release from Elmore's companies of all potential claims under the Assignment Agreement. D & J declined to purchase the property from Bent Creek after Elmore's companies refused to sign such a release.
 
 
 38
 During the time its negotiations with Bent Creek were taking place, D & J communicated to Manna that the deal might still go through. At the same time, D & J responded to FAB's inquiries that the loan proposal was still under consideration. It was not until after Elmore's companies' final refusal to sign a release that D & J informed FAB that the loan proposal would not be accepted.
 
 ANALYSIS
 
 39
 A. Summary Judgment Standard.
 
 
 40
 We review de novo the district court's grant of summary judgment in favor of D & J and "apply the same test as that used by the district court in reviewing a motion for summary judgment." Berlin v. Michigan Bell Tel. Co., 858 F.2d 1154, 1161 (6th Cir.1988) citing Hand v. Cent. Transp., Inc., 779 F.2d 8, 10 (6th Cir.1985). When considering a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." U.S. v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); see 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir.1987). However, the non-moving party bears the responsibility to demonstrate that summary judgment is inappropriate under Rule 56(e).
 
 
 41
 A court may grant summary judgment only if there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " Street v. J.C. Bradford & Co., 886 F.2d 1472, 1477 (6th Cir.1989) (quoting Anderson, 477 U.S. at 252, 106 S.Ct. at 2512).
 
 
 42
 B. Breach of Contract Claims by EDC and MWC.
 
 
 43
 Initially we conclude, as did the district court, that Tennessee law governs construction of the Assignment Agreement. Following removal to federal district court in North Carolina from North Carolina state court on the basis of diversity of citizenship, the case was transferred to the Eastern District of Tennessee, pursuant to 28 U.S.C. Sec. 1404(a). Tennessee law governs interpretation of the Assignment Agreement.[8]
 
 
 44
 A party's obligation to perform a contract is relieved if that party in good faith is unable to complete conditions precedent by a closing deadline. Covington v. Robinson, 723 S.W.2d 643, 645 (Tenn.App.1986) citing Strickland v. City of Lawrenceburg, 611 S.W.2d 832 (Tenn.App.1981). EDC's and MWC's right to enforce the Assignment Agreement against D & J depended upon the fulfillment of three conditions precedent: (1) Delivery to D & J of an "acceptable executed lease" with the anchor tenant, Carolina Pottery; (2) D & J's receipt of title to the development property, with the title "to be of a quality and nature acceptable to D & J," and (3) D & J's procurement of a construction and acquisition loan, on terms agreeable to D & J, in an amount sufficient to cover property purchase amounts and anticipated construction costs.
 
 
 45
 The district court concluded that D & J was within its rights to withdraw from the Assignment Agreement because the facts, when viewed in the context of all the circumstances, showed that the conditions were unmet to D & J's reasonable satisfaction on September 17. App., at 78. The district court also stated that "none of the evidence produced by the parties suggests that D & J did not use its best efforts" to ensure performance of the conditions precedent. App., at 82.
 
 
 46
 We disagree and find, after a thorough review of the record, that there are material facts in dispute demonstrating genuine issues resolvable only by a trial on the merits of EDC's and MWC's claims for breach of the Assignment Agreement. The material facts we find in dispute relate primarily to MWC's and EDC's claims that D & J failed to make good faith attempts to fulfill the conditions precedent with regard to the financing agreement and the anchor tenant lease with Carolina Pottery.[9] Our analysis follows.
 
 
 47
 We first consider what good faith means in the context of a real estate development contract subject to fulfillment of conditions precedent. In Tennessee, each party to a contract bears a duty of good faith and fair dealing in its performance and enforcement of the contract. See TSC Industries, Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn.App.1987) and Covington v. Robinson, supra, both cases citing Restatement (Second) Contracts Sec. 205 (1979) which states: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." In this context, courts examine the language of the contract and review the intention of the parties in order to "impose a construction which is fair and reasonable." TSC Industries, supra, at 173, citing Covington, supra, at 645-46; Savers Fed. Sav. & Loan v. Home Fed. Sav. & Loan, 721 F.Supp. 940 (W.D.Tenn.1989). As the Tennessee Court of Appeals recently stated, "[t]he question of reasonableness is a factual question to be determined by the trier of fact and, if there is a dispute, summary judgment would not be proper." Educational Placement Service, Inc. v. Watts, 789 S.W.2d 902, 904-905 (Tenn.App.1989) citing Covington v. Robinson, supra.
 
 
 48
 Paragraph 1 of the Assignment Agreement obligated D & J to use its "best efforts" to attempt to obtain a binding commitment for financing the land purchase and project construction by the commitment date, which was at the latest September 17, 1987. Even without an express contractual provision, a party to a contract must in good faith work to see that the terms of conditions precedent occur. Yarbrough v. Stiles, 717 S.W.2d 886 (Tenn.App.1986). Thus, "[w]hen a purchase agreement is contingent upon the buyer obtaining financing, implied in that agreement is a duty upon the buyer to make a reasonable effort to obtain adequate financing." Educational Placement Service, Inc. v. Watts, supra, citing Covington v. Robinson, supra.
 
 
 49
 In Covington, plaintiffs sought the return of $100,000 in earnest money paid to the defendants following the negotiation of a conditional agreement whereby plaintiffs agreed to purchase a large tract of farmland from defendants. Plaintiffs were obligated by the terms of the conditional agreement to attempt to obtain a loan that would supply 75% of the purchase price. Plaintiffs negotiated a loan that supplied only 73.98% of the purchase price and thereafter declined to close the deal because the loan condition precedent had not been met. There was conflicting evidence in the record concerning whether plaintiffs applied for the maximum loan amounts. However, there was no evidence showing any attempt by plaintiffs to reach the 75% loan amount after being granted a loan in a lower amount.
 
 
 50
 The Tennessee Court of Appeals upheld the lower court's finding that plaintiffs breached the contract by failing to make good faith efforts to obtain a loan in an amount that met the 75% loan contingency requirement after applying for and receiving a loan in an amount less than the required amount. Plaintiffs' failure to make any efforts to increase the loan amount was sufficient evidence to support the trial court's finding that plaintiffs did not exercise reasonable diligence in their performance of the conditions precedent. Id. at 646.
 
 
 51
 The evidence, when viewed in a light most favorable to EDC and MWC, raises a genuine issue concerning D & J's good faith performance of the conditions precedent sufficient to withstand a motion for summary judgment.
 
 
 52
 1. The Financing Agreement Condition.
 
 
 53
 As evidence in support of its claim that attempts to obtain financing were pursued with due diligence, D & J relies on its receipt of an informal, loan commitment letter from FAB on September 15, 1987, only two days prior to the September 17, 1987 closing deadline. D & J cites the testimony of Cantrell, FAB's Vice President, for the proposition that a formal, completed financing agreement based on the September 15th proposal could not be produced before the closing deadline. App., at 292. However, Cantrell's estimate of time to prepare a formal loan agreement takes on a new light when viewed in its context:
 
 
 54
 Q What was left to be done, or agreed upon, before First American [FAB] could prepare a formal commitment letter?
 
 
 55
 A I don't believe there was anything left to be done from an approval standpoint. We had approved it, and we were prepared to send a formal commitment letter in regard to this transaction. But Mr. Kane asked us not to do that; Just send this letter outlining the basic terms of the proposed commitment letter.
 
 
 56
 Q How long would it have taken to prepare a formal commitment letter?
 
 
 57
 A I would say two to three days.
 
 App., at 291-292.[10]
 
 58
 The district court reasoned that the alleged failure of Kane, D & J's chief negotiator, to request a binding loan commitment agreement demonstrates no evidence of bad faith failure to pursue the conditions precedent because there was no evidence that D & J was in fact prepared to exercise its "reasonable, commercial judgment" and sign a loan agreement. App., at 82-83.
 
 
 59
 However, a genuine issue for trial arises from D & J's alleged failure to ask FAB to draft a final loan commitment. As in Covington, "[t]he issue of good faith relates to efforts made to secure the financing prior to a refusal to close." Id. at 646. When performance of a condition precedent depends upon a financing agreement, an inference of lack of diligence or good faith in the performance of conditions precedent arises when no attempt is made by the contracting party to seek an agreement that satisfies the condition. Id., accord, Yarbrough v. Stiles, supra n. 2, at 889.
 
 
 60
 D & J further claims surprise at the condition in the September 15 loan proposal requiring personal guaranties of D & J's principals, calling the need for personal guaranties "a major new term." (Appellee's Brief at 34). Kane, D & J's chief negotiator for the Pigeon Forge project, stated in an affidavit that he did not remember any discussions with FAB concerning personal loan guaranties and that he was aware that D & J's principals, Jones and Harrod, did not like to give personal guaranties. App., at 188. However, during June 1987, Kane sent FAB the personal financial statements of D & J's principals, casting doubt on the accuracy of Kane's recollection.[11]
 
 
 61
 According to Madron's deposition testimony, Madron and Kane discussed the issue of personal guaranties, probably during the unsuccessful joint venture negotiations. Madron stated during his deposition testimony and several times in an affidavit that he told Kane that FAB would require personal financial statements of D & J's principals and would require the loans to be supported by Harrod and Jones' personal guaranties.
 
 
 62
 On one occasion near the end of his deposition, Madron stated that he was uncertain whether he talked to Kane in June or later during August concerning the issue of personal loan guaranties. D & J challenges Elmore and MWC's reliance on the Madron affidavit, filed after D & J's summary judgment motion, because Madron states in the affidavit that he talked to Kane during June 1987. D & J argues that the affidavit conflicts with Madron's deposition testimony concerning when he spoke to Kane about personal guaranties.
 
 
 63
 Although it is unclear whether the district court considered the Madron affidavit, it is "accepted precedent" that after a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting earlier deposition testimony. Gagne v. Northwestern Nat. Ins. Co., 881 F.2d 309, 315 (6th Cir.1989) (citations omitted); Laborers' Pension Trust Fund v. Weinberger Homes, 872 F.2d 702 (1988).
 
 
 64
 We find, however, that the conflict alleged by D & J is irrelevant to the present issue on appeal. Madron's affidavit and deposition testimony consistently affirm that he in fact talked with Kane concerning personal loan guaranties well in advance of the September 15, 1987 loan proposal, thus raising a disputed issue of material fact concerning whether or not the personal guaranties requirement was a new term to D & J. The affidavit and three out of four comments made by Madron at his deposition concerning the personal loan guaranties cite June as the month when the alleged discussion occurred. The affidavit leaves unaffected Madron's testimony that a conversation took place at least a month before the closing deadline.
 
 
 65
 Accordingly, the trier of fact must determine whether D & J in good faith relied upon allegedly unsatisfactory terms contained in the proposed loan agreement to justify its claim that "new terms" changed D & J's acceptance of the proposed loan agreement because there is material, credible evidence to impeach D & J's alleged lack of knowledge that FAB would require personal guaranties before making a loan.[12]
 
 
 66
 2. The Carolina Pottery Lease Condition.
 
 
 67
 The district court also found that D & J's dissatisfaction with the terms of the Carolina Pottery lease condition was reasonable when viewed in the context of the "severe time constraints" imposed by the Assignment Agreement to obtain the construction and acquisition loan. App., at 78. Specifically, the district court referred to D & J's concerns over the $1,000,000 inducement payment to Carolina Pottery and the fact that the lease did not contain the personal guaranties of Carolina Pottery's principals. App., at 77.
 
 
 68
 However, evidence cited by EDC and MWC supports an inference that D & J never asked for the unfulfilled lease conditions it wanted until a few days before the closing deadline. The $1,000,000 inducement payment to Carolina Pottery appeared in the June 1987 joint venture negotiations, but D & J raised no objections to the payment amount until September 14, 1987, three days before D & J's conclusion that the terms of the anchor tenant lease were unsatisfactory. Further, D & J first requested the personal guaranties from Carolina Pottery principals after Fleming and Hicks signed a lease agreement on September 14. The evidence permits an inference that the severe time constraints were a product of D & J's last minute negotiations to bargain for favorable terms notwithstanding what may be viewed as D & J's acquiescence to the bargaining terms already on the table.
 
 
 69
 Thus, on both the financing and lease conditions, the evidence would support a finding that D & J obtained the terms that it requested. If, as D & J now contends, more was required, its failure to make a timely request for the necessary terms permits a finding that D & J failed to exercise reasonable diligence in seeking acceptable terms, and a finding that D & J breached its duty to attempt in good faith to satisfy the conditions precedent to the agreement's performance.
 
 
 70
 Although we focus on the facts that raise an inference of bad faith as to D & J's attempts to fulfill the conditions precedent, we agree with EDC and MWC that there is sufficient evidence to provide an inference that the conditions precedent were fulfilled to D & J's satisfaction as they existed on September 17. Tennessee applies two different standards to "satisfaction clauses" depending upon the subject matter of the contract. In Tennessee & Southeastern Coal Co. v. Schwitzer-Cummins Co., 173 Tenn. 524, 121 S.W.2d 553 (1938), the Supreme Court of Tennessee described how satisfaction clauses should be interpreted:
 
 
 71
 [T]his court has been far from invariable acceptance of the idea that when a contract is to be performed to the satisfaction of a party thereto such party has an absolute right to pass on the character of the performance. The court has recognized such right when feelings, taste or sensibilities were involved, as in the making of a costume or the painting of a portrait. Where the question, however, was one of mere value, we have inclined to the opinion that a performance satisfactory to a reasonable man would be sufficient.
 
 
 72
 Id. 121 S.W.2d at 556 (citations omitted); see D.W. Winkleman Co. v. Barr, 178 F.2d 341 (6th Cir.1949) and Jackson v. Roosevelt Federal Sav. and Loan Ass'n, 702 F.2d 674 (8th Cir.1983).
 
 
 73
 We hold, as did the district court, that satisfaction of conditions contained in the Assignment Agreement must be viewed from the perspective of a reasonable man, and not D & J's subjective beliefs concerning their satisfaction. The terms of the joint venture negotiations and D & J's post-Assignment Agreement interest in the project supply an inference that D & J was satisfied with the fulfillment of the conditions on September 17, 1987, but wanted to perform the project without the involvement of Elmore and his companies.
 
 
 74
 Because the district court prejudged the outcome by giving effect to the nonfulfillment of the conditions precedent without due consideration of the evidence disputing D & J's good faith attempts to meet those conditions, and as to whether D & J reasonably evaluated the satisfaction of those conditions, we vacate the district court's grant of summary judgment as to EDC's and MWC's breach of contract claims and remand those claims to the district court.
 
 
 75
 C. Tortious Interference with Contracts Claims.
 
 
 76
 EDC, PFOM and Manna all assert claims against D & J for tortious interference with contracts with third parties. EDC claims that D & J interfered with its contract with Bent Creek to purchase the Pigeon Forge development property. PFOM claims that the "same intentional and improper conduct" prevented PFOM from performing its contracts with Manna, the general contractor for the project, and Guthrey, the project's architect. Manna claims that D & J's conduct interfered with PFOM's ability to perform its contract with Manna and on appeal claims that Manna was prevented from completing its contract with PFOM.[13]
 
 
 77
 We again apply North Carolina's choice of law rules to determine the appropriate law to apply to the appellants' tort law claims. Although North Carolina courts do not follow a uniform rule, there is a trend to apply the "most significant relationship" test to commercial tort cases where the conduct is spread throughout several states. The traditional rule of lex loci delecti remains the tort law choice of law test for personal injury and wrongful death claims. The In Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494, 503 n. 9 (M.D.N.C.1987). D & J argues that North Carolina substantive law governs this issue because D & J's allegedly wrongful decisions were issued from North Carolina. However, Tennessee is the state where the prevented performance was to occur. Because the result would be the same applying either North Carolina or Tennessee law, and because North Carolina choice of law principles do not provide a guiding standard to discern which law to apply, we decline to resolve this choice of law issue.
 
 
 78
 In North Carolina, the tort of interference with contractual relations has five elements:
 
 
 79
 (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.
 
 
 80
 United Laboratories, Inc. v. Kuykendall, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988) citing Childress v. Abeles, 240 N.C. 667, 84 S.E.2d 176 (1954).
 
 
 81
 Tennessee has codified the tort of interference with contractual relations at Tenn.Code Ann. Sec. 47-50-109:Procurement of breach of contracts unlawful--Damages.-- It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract. The party injured by such breach may bring his suit for the breach and for such damages.
 
 
 82
 In TSC Industries, Inc. v. Tomlin, 743 S.W.2d 169 (Tenn.App.1987), the Tennessee Court of Appeals set forth the elements that a plaintiff must establish to obtain relief under the above statute:
 
 
 83
 The plaintiff must prove: (1) that there was a legal contract; (2) that the wrongdoer had sufficient knowledge of the contract; (3) that the wrongdoer intended to induce its breach; (4) that the wrongdoer acted maliciously; (5) that the contract was breached; (6) that the act complained of was the proximate cause of the breach; and (7) that damages resulted from the breach.
 
 
 84
 Id. at 173 (citations omitted).
 
 
 85
 EDC, PFOM and Manna claim that D & J intentionally interfered with appellants' contracts with third parties by D & J's alleged breach of the Assignment Agreement and alleged bad faith refusal to complete the conditions precedent to that agreement. It is well established that as between a promisor and a promisee, an alleged breach of the contract does not normally give rise to a separate tort action for breach of the contract. W.A. Becker v. Celebration, Inc., 541 F.2d 156, 159 (6th Cir.1976) (applying Tennessee law); North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 S.E.2d 345, 350 (1978); see Battista v. Lebanon Trotting Ass'n, 538 F.2d 111 (6th Cir.1976).
 
 
 86
 However, this case must resolve whether the alleged breach of the Assignment Agreement and D & J's post-agreement negotiations support the appellants' claims that D & J intentionally induced or persuaded the breach of their agreements with third parties. The appellants rely on the Tennessee decision in Lichter v. Fulcher, 22 Tenn.App. 670, 125 S.W.2d 501 (1938). In Lichter, the plaintiffs and defendants were brick and tile contractors competing for construction projects. Plaintiffs alleged that defendants induced members of a local bricklaying union to refuse to work for the plaintiffs by making false allegations concerning plaintiffs' alleged violations of job bidding procedures. The Tennessee Court of Appeals upheld the Chancellor's finding that defendants interfered with plaintiffs' ability to hire bricklayers due to the defendants' false allegations. Id. 125 S.W.2d at 506.
 
 
 87
 EDC, PFOM and Manna also argue that in North Carolina, a claim for tortious interference with contract is established where a defendant wrongfully and arbitrarily refuses to permit fulfillment of another's contract, citing L & H Investments, Ltd. v. Belvey, Corp., 444 F.Supp. 1321 (W.D.N.C.1978). In L & H Investments, defendant leased store space to plaintiff pursuant to the terms of a lease agreement. According to the lease, plaintiff needed the defendant's consent in order to assign its interest in the lease to a third party. Plaintiff claimed that defendant arbitrarily refused to grant its consent to a proposed sale of plaintiff's interest to a third party. The district court denied defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss because it found that plaintiff's allegations stated a claim for intentional interference with contract. The court reasoned that the tort of intentional interference prohibits the arbitrary refusal to consent to the terms of a proposed agreement between parties to a contract in need of the defendant's consent. Id. at 1325-26.
 
 
 88
 In both states, a key element of the tortious interference with contract claim is the defendant's intentional act to induce or persuade a third party to breach its contract with the plaintiff or, as in L & H Investments, to prevent formation of a proposed contract between a plaintiff and a third party by arbitrarily withholding its consent. The defendant's intentional interference with a third party to a contract lays the groundwork for the tort and is separate from the issue of the breach of the main agreement. Appellants's tortious interference claims fail because there is no evidence to establish that D & J intended to induce the breach of or arbitrarily withheld its consent to permit the formation of any agreements between EDC, PFOM and Manna and third parties to those contracts. Unlike the contracts between plaintiffs and third parties in Lichter and D & H Investments, D & J did not act to prevent the appellants from independently completing their own contracts. After D & J's September 17, 1987 decision to end its participation in the project, EDC could have kept the offer from Bent Creek open by paying an additional $50,000 to Bent Creek by September 18, 1987. D & J did not prevent the pursuit of back-up financing sources in the event that the conditions precedent to the Assignment Agreement were not met. The reliance of EDC, PFOM and Manna on D & J's performance of the Assignment Agreement does not supply the inference of D & J's intentional interference necessary to sustain an action for the tort of intentional interference with contract in either Tennessee or North Carolina.[14] Accordingly, we affirm the district court's grant of summary judgment to D & J on the appellants' tortious interference with contract claims.
 
 
 89
 D. Third-Party Beneficiary Claims.
 
 
 90
 Both Manna and PFOM claim to be third-party beneficiaries of the Assignment Agreement and further claim that D & J's alleged breach of that agreement hindered their abilities to perform contracts with one another and with third parties. We disagree and affirm the district court's finding that neither Manna nor PFOM was a third-party beneficiary of the Assignment Agreement.
 
 
 91
 Tennessee law[15] recognizes two kinds of third-party beneficiaries, intended and incidental. Only if a party is an intended beneficiary may it maintain an action to enforce the contract. Moore Construction Company, Inc. v. Clarksville Department of Electricity, 707 S.W.2d 1 (Tenn.App.1985). Further, there is a presumption that a contract is executed solely for the benefit of the parties to it. Id. at 9. Thus, to establish that they are intended beneficiaries to the contract, Manna and PFOM must establish (1) the existence of a valid contract between the principal parties and (2) that the clear intent of the contract is to benefit them. United American Bank of Memphis v. Gardner, 706 S.W.2d 639, 641 (Tenn.App.1985). Intent to benefit may be shown if "there is either an expression in the contract that the contracting parties intended to benefit the third party (the 'intent to benefit' test) or proof that the promisor's performance will otherwise discharge a duty owed to a third party beneficiary by the promisee (the 'duty owed' test)...." Moore Construction, supra, at 9.
 
 
 92
 In Moore Construction, two different prime contractors were hired to build a new office building for the defendant Clarksville Department of Electricity ("Department"). The plaintiff prime contractor claimed to be a third-party beneficiary of an agreement between the other prime contractor ("Kennon") and the Department. The court found that a promise made by Kennon to keep the work area clean and not interfere with the plaintiff's work in a contract with the Department created a third-party beneficiary interest in the plaintiff. Id. at 11.
 
 
 93
 Both PFOM and Manna rely upon Paragraph Four of the Assignment Agreement as evidence that the Assignment Agreement was clearly intended to benefit them. Paragraph Four provides:
 
 
 94
 4. Contractor's and Architect's Contracts: D & J hereby agrees to enter into negotiations with the intent to enter into a construction management contract on the Project with Manna Construction Inc. and enter into negotiations with the intent to enter into an architect's contract with Guthrey & Hurt, Inc., [sic] both to be upon terms and conditions substantially similar to those previously negotiated by Elmore [EDC], and on terms reasonably satisfactory to D & J.
 
 
 95
 App., at 14-15.
 
 
 96
 1. Intent to Benefit Test.
 
 
 97
 Manna refers to D & J's obligation to negotiate a construction management contract with Manna in Paragraph 4 as evidence of the intent to benefit Manna by the Assignment Agreement. This is the only reference to Manna in the Assignment Agreement. Although not named in the Assignment Agreement, PFOM claims that it was a direct intended beneficiary of D & J's negotiations described in Paragraph 4 of the Assignment Agreement because D & J would, if successful, relieve PFOM's duty to perform preexisting contracts with Manna and the architects.
 
 
 98
 We previously held that the EDC and MWC, as parties to the Assignment Agreement, alleged facts sufficient to withstand D & J's motion for summary judgment. Both Manna and PFOM argue that the facts supporting the alleged breach of the Assignment Agreement and the inferences therefrom validate their third-party beneficiary claims against EDC and MWC. We disagree. As to Manna, the terms of the Assignment Agreement required D & J to enter into negotiations with Manna with the intent to enter into a management contract. Although the agreement recognizes pre-existing contracts EDC and MWC had with Manna and the project architects, evidence of direct intent to benefit Manna is lacking because there is no assignment of those contracts by EDC and MWC to D & J and no adoption of those contracts by D & J. Thus, the language of the contract itself indicates that Manna is not a direct beneficiary under the Assignment Agreement.
 
 
 99
 Moreover, Paragraph 10 of the Assignment Agreement states that the agreement shall bind only the parties and their successors and assigns and that changes may only be made in writing upon the approval of the parties. No amendments to the Assignment Agreement are contained in the record. Similar language has been held to demonstrate that the terms of a contract were intended only to benefit the parties to the contract. King v. National Industries, Inc., 512 F.2d 29 (6th Cir.1975).
 
 
 100
 We observe that the Assignment Agreement's integration clause, Paragraph 11, would ordinarily preclude Manna and PFOM from introducing evidence beyond the four corners of the document. However, proof of third-party beneficiary status may come from the circumstances surrounding the execution of the contract. Moore Construction, supra, at 9-10. D & J objected to drafts of the assignment agreement that required D & J to assume preexisting contracts involving Manna and PFOM. App., at 455-486. The surrounding circumstances demonstrate D & J's knowingful refusal to assume the terms of contracts Elmore's companies previously negotiated with third parties. Cf. In re Edward M. Johnson and Associates, Inc., 845 F.2d 1395, 1398 (6th Cir.1988) ("[o]bvious purpose" of contract was to benefit third party). Thus, we agree with the district court that D & J's promise to negotiate with Manna with the intent to enter into a construction manager's contract does not demonstrate that Manna was a direct, intended beneficiary of the Assignment Agreement.
 
 
 101
 Likewise, with regard to PFOM, the Assignment Agreement recites no intent to benefit PFOM by assuming PFOM's contracts with third parties and no intent to benefit PFOM may be gathered from the circumstances surrounding the execution of the Assignment Agreement. At most, the benefits to PFOM as a result of performance of the Assignment Agreement would make PFOM an incidental beneficiary of the agreement.
 
 
 102
 2. The Duty Owed Test.
 
 
 103
 In order to prevail under the 'duty owed' test, Manna and PFOM must show that the promisor's performance, in this case D & J, will otherwise discharge a duty owed to a third-party beneficiary by the promisees EDC, MWC and PFOM. Moore Construction, Id. However, D & J's refusal to assume the preexisting contracts Elmore negotiated on behalf of his companies with Manna and PFOM demonstrates that D & J did not intend by the Assignment Agreement to discharge Elmore's companies's duties to Manna and PFOM.
 
 
 104
 Accordingly, because there is no clear evidence that the parties to the Assignment Agreement intended to clearly confer a benefit to Manna and PFOM, we affirm the district court's grant of summary judgment as to Manna's and PFOM's third-party beneficiary claims.
 
 CONCLUSION
 
 105
 For the foregoing reasons, we VACATE the grant of summary judgment as to EDC's and MWC's breach of contract claims and REMAND those claims to the district court. In all other respects, the district court's grant of summary judgment to D & J is AFFIRMED.
 
 APPENDIX I
 DAVIDSON & JONES
 GLOSSARY OF PARTIES AND PERSONS
 
 106
 Davidson & Jones Development Co.: "D & J": Plaintiff-Appellee
 
 
 107
 Keith Harrod: "Harrod": Principal of D & J
 
 
 108
 Robert C. Jones: "Jones": Principal of D & J
 
 
 109
 Julian Peebles: "Peebles": Senior Vice President of D & J
 
 
 110
 Gary Paul Kane: "Kane": D & J's Chief Financial Officer
 
 
 111
 Bill Hicks: "Hicks": Vice President of D & J
 
 
 112
 Elmore Development Co.: "EDC": Defendant-Counterclaimant-Appellant
 
 
 113
 Lee Larson Elmore: "Elmore": President of EDC
 
 
 114
 MWC Properties, Inc.: "MWC": Defendant-Counterclaimant-Appellant (Formed by Elmore)
 
 
 115
 Pigeon Forge Outlet Mall, Inc.: "PFOM": Counterplaintiff-Appellant (Formed by Elmore)
 
 
 116
 Manna Construction Company: "Manna": Intervening Counterplaintiff
 
 
 117
 Bent Creek, Inc.: "Bent Creek": Landowner in bankruptcy of the 6.7 acres in Pigeon Forge, Tenn.
 
 
 118
 Guthrey & Hart: "Guthrey": Proposed Project Architect
 
 
 119
 Carolina Pottery, Inc.: "Carolina Pottery": Prospective anchor tenant in shopping center
 
 
 120
 Dixon Fleming, Jr.: "Fleming": Negotiated anchor tenant lease agreement on behalf of Carolina Property
 
 
 121
 First Southern Mortgage Company: "First Southern": Retained to help locate persons or entities to provide necessary financing backing
 
 
 122
 First American Bank in Knoxville: "FAB": Expressed interest in making loan to finance project.
 
 
 123
 John Cantrell: "Cantrell": FAB's Senior Vice President for real estate division.
 
 
 124
 Joe Madron: "Madron": Vice President of FAB
 
 
 
 *
 The Honorable David D. Dowd, Jr., Judge, United States District Court for the Northern District of Ohio, sitting by designation
 
 
 [1]
 The following statement of facts names nineteen different actors involved in the proposed development project. To assist the reader, a glossary containing a description of persons and business entities involved in the project is attached as Appendix I
 
 
 [2]
 The first amendment to the purchase agreement essentially substituted Bent Creek for the named seller, Glenstone Development Company
 
 
 [3]
 The Assignment Agreement declared that EDC would assign its property interests in the project to MWC. The amount to be paid by D & J is $200,000 over the $1.8 million that EDC was to pay Bent Creek for the property
 
 
 [4]
 Paragraph 6 of the Assignment Agreement provides:
 
 
 [6]
 Contingency. The parties hereto acknowledge that all rights and obligations hereunder are contingent upon the consummation of a lease agreement for space in the Project with Carolina Pottery; provided, however, in the event D & J closes on the acquisition and/or construction loan as contemplated in paragraph 1 hereof D & J shall be deemed to have waived the contingency provided in this paragraph 6
 App., at 15.
 The district court suggested that according to Paragraph 6, D & J would waive the Paragraph 1 anchor tenant lease condition precedent if D & J closed on a construction and acquisition loan by the agreement's deadline. App., at 78-79. We disagree. Paragraph 6 waives only the restated contingency of an anchor tenant lease provided by Paragraph 6 but cannot be read to affect the conditions precedent contained in Paragraph 1.
 
 
 [5]
 The parties have all maintained that September 17 was the deadline for D & J to obtain a binding loan commitment. However, the parties have not addressed the potential significance of September 12, 1987, five days before the Commitment Date. The Assignment Agreement provides that if there was no binding loan commitment five days before what is referred to in the contract as the "Commitment Date," the Assignment Agreement would become null and void. App., at 11-12
 
 
 [6]
 Several copies of the proposed lease were signed. The record is unclear as to whether Fleming's signature on the lease was sufficient or whether his father, Dixon Fleming, Sr., would have been required to sign the lease for it to be binding. It is also unclear whether the lease form signed by Peebles and Hicks bound D & J. In any event, although Fleming thought that he signed a lease form representing the major terms of the agreement between the parties, he acknowledged that Carolina Pottery of Pigeon Forge, Inc. was never formed because "the deal fell through." App., at 72
 
 
 [7]
 Although D & J now contends that the title condition was not fulfilled, there is no evidence that title concerns were discussed at the September 17 meeting
 
 
 [8]
 The district court correctly applied North Carolina's choice-of-law rules to the breach of contract claim because North Carolina is the state from which the case was transferred. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 243 n. 8, 102 S.Ct. 252, 259 n. 8, 70 L.Ed.2d 419 (1981). A choice-of-law provision in the Assignment Agreement states that Tennessee law shall govern construction of the document and North Carolina enforces contractual choice-of-law provisions. A.E.P. Industries v. McClure, 308 N.C. 393, 302 S.E.2d 754 (1983)
 
 
 [9]
 The third condition precedent requiring delivery of a title to D & J's satisfaction was not addressed by the district court. D & J raises its dissatisfaction with the title on appeal but the record is not sufficiently well developed to justify summary judgment on the basis of the title
 
 
 [10]
 FAB's Vice President, Joe Madron, corroborated Cantrell's testimony that D & J received an informal loan proposal because that is what Kane, D & J's Vice President, requested. App., at 807
 
 
 [11]
 Cantrell cannot remember asking Kane to send personal guaranties even though Kane sent Harrod's and Jones's financial records to Cantrell. However, Cantrell testified that D & J indicated to him that personally guaranteeing the debt would pose no problem to D & J. App., at 299
 
 
 [12]
 On March 23, 1990, after the appellate briefs were filed, D & J submitted an updated list of citations including the recent decision of the Tennessee Court of Appeals in Educational Placement Service, Inc. v. Watts, supra. Watts stands for the proposition that the duty of good faith does not obligate a corporation to accept a loan conditioned upon a personal guaranty by the corporation's president
 However, appellee's reliance on Watts in the present context is misplaced. D & J argues that the personal guaranties requirement is a "new term" in the proposed loan agreement but there is evidence, when viewed in a light most favorable to appellants, to indicate that Kane, D & J's chief negotiator, had been told that personal guaranties would be required to secure FAB's loan to D & J. Thus, the issue is not whether D & J was obligated to accept the personal loan guaranty requirement but rather whether D & J may argue that they were surprised by the appearance of personal loan guaranties in the proposed loan agreement. Based upon evidence concerning the latter issue, summary judgment was inappropriate.
 
 
 [13]
 Because we affirm the district court's grant of summary judgment as to all of the pending tortious interference claims, we need not decide D & J's argument that Manna should be barred from asserting the claim on appeal that D & J's tortious interference prevented Manna from completing its contract with PFOM because Manna failed to raise the issue before the district court
 
 
 [14]
 EDC, PFOM and Manna also base their tortious interference claim on Restatement (Second) Torts Sec. 766A, which provides:
 Intentional Interference with Another's Performance of His Own Contract
 One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.
 We note that neither Tennessee nor North Carolina has adopted this section of the Restatement, and given the already developed substantive law in both states concerning the tort, we decline to follow the Restatement in this area.
 
 
 [15]
 We apply Tennessee law to PFOM's and Manna's third party beneficiary claims because the Assignment Agreement, the contract from which PFOM and Manna seek their remedy, contains a choice of law provision specifying that Tennessee law governs resolution of suits brought under the contract