Stephen R. COVINGTON and William B. Hurt, Jr., Plaintiffs-Appellants,

v.

Cooper Y. ROBINSON, et al., Defendants-Appellees.

Court of Appeals of Tennessee, Western Section, at Jackson.

Sept. 18, 1986.

Permission to Appeal Denied by Supreme Court Jan. 20, 1987.

James W. Surprise, Johnson, Grusin, Kee, Posner & May, Memphis, for plaintiffs-appellants.

Michael Richards and Eugene J. Podesta, Jr., Ronald L. Coleman, Memphis, for defendants-appellees.

BROOKS McLEMORE, Special Judge.

This case involves a claim by prospective purchasers of realty for the return of earnest money in the amount of $100,000 deposited with defendant, International Farm Management, Inc., pursuant to a written contract for the sale of said realty. The trial court in a bench trial dismissed the claim and we affirm.

Cooper Y. Robinson and William W. Robinson, defendants-sellers, owned approximately 1,567 acres of land in Arkansas. On March 13, 1980, the sellers and plaintiff-purchasers, Stephen R. Covington and William B. Hurt, Jr., contracted for the sale and purchase of the property for $2,010.675. Defendant International Farm Management, Inc. acted as agent in the sale.

The contract provided:

It is understood and agreed that this Contract is contingent upon Buyers obtaining a federal land bank loan on the property for seventy-five percent of the purchase price.

Pursuant to the contract the purchasers posted $100,000 earnest money. Upon default by the purchasers this deposit was to be divided equally between International Farm Management, Inc. and the sellers.

The real estate lies in two counties, Woodruff County and Cross County. Because of this, it was necessary to apply to two different offices for the loan mentioned in the contract. The purchaser, Covington, testified that Mr. Donald E. Brown, Jr., President of the Federal Land Bank of Eastern Arkansas, carried the ball on the loan and that he (Covington) and his associate applied for the "maximum loan" on the property. The testimony of Mr. Covington and Mr. Brown as to the request for the loan is devoid of any statements that 75% of the purchase price was necessary to make the purchase. Mr. Brown testified that the loan application was first made out in pencil and after conferences were had with other officials, typewritten applications were made up. Copies of these typewritten applications were exhibits but neither of these exhibits is signed by the applicants. The applications show that $907,500 or 78.59% of the value of the land in Woodruff County was applied for to the Land Bank of Searcy, Arkansas, and that $580,000 or 67.83% of the value of the land in Cross County was applied for from the Federal Land Bank Association of Eastern Arkansas plus $137,500 for improvements. The gross total money, not counting $137,500 for improvements, was $1,487,500 or 73.98%. If the money for improvements is considered the total percentage would be 80.81863.

The sums set out in these applications were approved and the applicants so notified. No effort was made and no request made by the applicants to the Land Banks to increase the amount of these loans the additional 1.02%.

Purchasers on July 9, 1980, declined to close the deal stating that the amount approved by the Land Bank was slightly less than 75%. Purchasers then made a proposal that amounted to a request that sellers carry as a loan the difference in the 73.98% loan from the Land Bank and the purchase price for five years and pay the interest on the Federal Land Bank loan from date of closing until January 2, 1981.

Sellers maintained that the purchasers had obtained a loan in excess of 75% of the purchase price, however, agreed to reduce

the purchase price by the sum of $28,000 which would result in a sale price that would come within the 75% requirement if based upon buyers contention that the loan amounted to only 73.98%.

The purchasers still declined to close and the earnest money was divided pursuant to the contract. Purchasers then instituted this action.

The trial judge after hearing the matter on some written and some oral testimony found that the $137,500 improvement money was not money included in the loan for the purchase of the land and the loan money available to the purchasers was 73.98% of the purchase price, and that this amount constituted substantial compliance with the contingency in the contract regarding 75% financing. He further found that the purchasers failed to make a good faith effort to close the transaction, and found that the sellers' offer to reduce the amount brought the loan within strict compliance with the 75% contingency and that there was a lack of good faith on the part of the purchasers in that the loans approved for the purchasers were in the exact amount that the purchasers requested, that they submitted only one set of applications and made no further attempt to increase this amount and that purchasers refusal to perform constitutes a default of their contractual obligations and that retention of the $100,-000 was reasonable.

Purchasers have appealed contending that:

(1) The 75% loan contingency was a condition precedent to purchasers' obligation to perform and obtaining a loan commitment of 73.98% is not substantial performance and that, in any event, substantial performance is not sufficient to excuse the non-occurrence of a condition precedent.

(2) The trial court erred in finding the purchasers guilty of bad faith in their efforts to obtain the loan.

(3) The earnest money provision was an unenforceable penalty.

(4) It was error to admit evidence of subsequent offers by sellers after the transaction failed to close.

■ We agree that the 75% loan contingency is a condition precedent. *Restatement 2nd, Contracts*, § 224 defines such a condition as:

An event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

In the commentary to *Restatement, 2d Contracts*, § 237, at p. 220 the Reporter says:

If however, the parties have made an event a condition of their agreement, there is no mitigating standard of materiality or substantiality applicable to the non-occurrence of that event.

*In Real Estate Management v. Giles*, 41 Tenn.App. 347, 293 S.W.2d 596 (1956), the court said:

A conditional contract is a contract whose very existence and performance depends upon the happening of some contingency or condition expressly stated therein ...

No liability under the contract attaches to either party until such condition precedent is fulfilled. *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832 (Tenn.Ct. of App.1981).

We hold that the trial court was in error in holding that the obtaining of a loan in the amount of 73.98% is substantial performance that will excuse the non-occurrence of the condition precedent.

The issue of good faith is another matter.

Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Restatement, 2d Contracts*, § 205, 17 Am.Jur.2d *Contracts* § 256.

Generally, in construing contracts, the courts not only look to the language of the instrument, but must ascertain, if possible, the intention of the parties, and the construction which is reasonable and fair will

prevail. *Real Estate Management v. Giles, supra.*

The purchasers were not neophytes in the purchase of large tracts of farm land. The evidence indicates that they speculated in land. Covington pointed out that the purpose for the 75% financing provision in the contract was, "we made a determination earlier that we had to receive seventy-five percent. There has to be a point somewhere to make the deal work or not work."

■ It was the duty of the purchasers to make a reasonable effort to obtain adequate financing.

Purchasers insist that their request for a "maximum loan" coupled with the subsequent testimony of Mr. Brown that no greater amount would have been loaned if requested is sufficient to satisfy the requirement of good faith or reasonable diligence to obtain the 75% loan. The record discloses that Mr. Covington testified that he asked for the "maximum amount". Mr. Brown's testimony is uncertain as to exactly what was asked. On this point the testimony of Mr. Brown is:

Q. (By Mr. Surprise) Did Mr. Covington and Mr. Hurt make any requests for any specific sums of money in their application?

A. I really, I can't answer that. I don't remember. That's too far ...

Q. You made a comment earlier that—

A. I just know that they probably said maximum amount, and that could be right, it could be—

Q. (By Mr. Surprise) You are also required to answer the question to the best of your ability, bearing in mind that you are under oath to tell the truth. Now—Do you recall—You made the comment earlier regarding the maximum amount. That was a comment you made. Do you recall whether that phrase or words to that effect, maximum amount, were requested by Mr. Hurt and Mr. Covington, or did they request specific sums of money?

A. Well, to answer Mike, it's hard to answer your question.

Q. Do you recall whether they requested specific sums of money?

A. All I can say is I think. I think it was that they requested the maximum amount.

■ The issue of good faith relates to efforts made to secure the financing prior to a refusal to close. The record is devoid of any evidence that the purchasers knew that no greater amount would have been loaned by the lending agency at the time the purchasers refused to close. Asking for a "maximum loan" and actually applying for a lesser loan 1.2% short of what was required by the contract, and never at anytime specifically requesting the 75% or pointing out to the lending agency the need for 75% in order to make the deal, together with no request for the additional amount after the 73.98% was approved is sufficient evidence alone for the trial court to find lack of reasonable diligence or good faith. See *Smith v. Evans*, 620 S.W.2d 627 (Tex. Civ.App.1981). Certainly the evidence does not preponderate against such a finding. T.R.A.P. 13(d).

■ Purchasers assert that the trial judge erred in admitting evidence regarding the sellers' offer to reduce the purchase price and bring the loan within the 75% contingency. Purchasers contention is that this action was a new offer after the failure of the contingency and was therefore an offer of settlement, and thus inadmissible as a matter of public policy. They further contend that the evidence was irrelevant to the issue of whether a breach had occurred.

We cannot agree.

As previously stated it is necessary for the purchasers to show that they had made a reasonably diligent effort to obtain the financing required. When all the circumstances that appear here are considered, we are of the opinion that the trial judge was correct in admitting the evidence as being probative on that issue.

■ The purchasers contend that the earnest money in the amount of $100,000

constitutes a penalty and is unenforceable and the trial court erred in finding that the sum constituted liquidated damages. They additionally contend that since the sellers sold the property to third parties approximately two months after the purchasers notified them that they were unable to obtain 75% financing that if damages are allowable at all the damages would be limited to the difference of the contract sale price and the selling price to third parties, i.e., approximately $10,650.

The purchasers rely heavily upon an unreported case from the middle section of this Court, *Monts v. Campbell* (Tenn.App. 1984). The case is distinguishable from the case *sub judice*. Additionally, we are of the opinion that the law to be applied is Arkansas law, though the law of Tennessee if applied would not mandate a different result. See *V.L. Nicholson Company v. Transcon Investment and Financial Limited Inv.*, 595 S.W.2d 474 (Tenn.1980).

The applicable contract language is:

> ... In the event the Buyers default, the earnest money will be divided equally between International Farm Management and Sellers.

It is to be noted that the words "penalty", "forfeiture" or "liquidated damages" do not appear in the foregoing language.

The controlling law is found in the case of *Alley v. Rodgers*, 599 S.W.2d 739 (Ark. 1980):

> It is well settled that a contract will be construed as properly stipulating for liquidated damages where, from a prospective view of the contract, it appears (1) that the parties contemplated that damages would flow from a failure to perform the contract; (2) that such damages would be indeterminate or difficult to ascertain; and (3) that the sum bears some reasonable proportion to the damages which the parties contemplated might flow from a failure to perform the contract. (Citing cases)
> In determining the proper interpretation of a provision for damages, we must "place ourselves in the position of the contracting parties and view the subject-

matter of their contract prospectively, and not retrospectively." "This question is one generally somewhat difficult of solution, and there is no fixed rule by which all cases may be governed, as each case is established by its own particular facts."

In support, see also, *Parker v. Whistle*, 227 Ark. 731, 301 S.W.2d 445, (1957), *Phillips v. Ben M. Hogan Co., Inc.*, 267 Ark. 1104, 594 S.W.2d 39 (1980).

Two additional Arkansas cases are noteworthy for their factual similarities to the present case. In both *Hall v. Weeks*, 214 Ark. 703, 217 S.W.2d 828 (Ark.1949), and *Smith v. Dixon*, 238 Ark. 1018, 386 S.W.2d 244 (1965), the court addressed liquidated damages clauses in real estate sales contracts. The provisions were enforced in both cases. In each of these two cases, the defaulting buyer argued that the amount of the stipulated damages was unreasonable in light of the circumstances. In *Hall v. Weeks*, the court upheld a $4,000 liquidated damage clause on a $40,000 contract saying, "nor is the situation materially changed because within five or six weeks Hall sold for $45,500." In *Smith v. Dixon*, a $15,000 award was enforced on a $200,000 contract.

At the time the contract before us was entered into, it was next to impossible to determine what damages would result from the purchasers breach. The property could have remained on the market for an indefinite period, and therefore, be subject to the radical variation in price that the market for farmland can experience. All of the prerequisites for enforcement of a liquidated damage provision as outlined by the Arkansas cases are present in the instant case. There is nothing to indicate the amount is unconscionable or disproportionate to the damages apparently likely to result from a breach. The liquidated damages represent only 5% of the total purchase price which is smaller than the percentages upheld in *Hall v. Weeks* and *Smith v. Dixon*.

The fact that the property was subsequently sold for $2,000,000 is not relevant as the Court will not take a "retrospective view".

The judgment of the trial court is affirmed. Costs are taxed against appellants, Stephen R. Covington and William B. Hurt, Jr., for which let execution issue, if necessary.

CRAWFORD and HIGHERS, JJ., concur.