IN THE COURT OF APPEALS OF TENNESSEE
WESTERN SECTION AT JACKSON

FILED

July 1, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

ANTHONY P. GUILIANO,

      Plaintiff-Appellee,

Vs.

      Shelby Circuit No. 67428
      C.A. No. 02A01-9608-CV-00201

CLEO INC.,

      Defendant-Appellant.

---

FROM THE SHELBY COUNTY CIRCUIT COURT
THE HONORABLE JAMES E. SWEARENGEN, JUDGE

Frank L. Watson, III; Waring Cox, PLC of Memphis
For Appellee

James H. Stock, Jr. and George H. Rieger, II;
Weintraub, Robinson, Weintraub, Stock, Bennett,
Ettingoff & Grisham, P.C. of Memphis
For Appellant

*REVERSED AND REMANDED*

Opinion filed:

W. FRANK CRAWFORD,
PRESIDING JUDGE, W.S.

CONCUR:

ALAN E. HIGHERS, JUDGE

HEWITT P. TOMLIN, JR., SENIOR JUDGE

      This is a breach of an employment contract case. Defendant, Cleo, Inc. (Cleo), appeals

the order of the trial court granting summary judgment in favor of plaintiff, Anthony P. Guiliano

(Guiliano).

The material facts are essentially undisputed. Cleo is a Tennessee corporation engaged in the production and manufacture of gift wrap and related accessories, and its principal place of business is in Memphis, Tennessee. In 1991, Cleo hired Guiliano as one of its directors of marketing. In November of 1992, Cleo promoted Guiliano to Vice President of Marketing and entered into a contract (Agreement) stating the terms of this employment. This Agreement, consisting of a letter from Michael Pietrangelo, then Cleo's President and Chief Executive Officer, provided in relevant part as follows:

> Cleo Inc and I are very pleased that you have agreed to serve as Vice President, Marketing of Cleo Inc (the "Company"), a wholly owned subsidiary of Gibson Greetings, Inc.[1] As Vice President, Marketing you will report to the President, and perform those functions currently assigned, which functions and responsibilities can be changed at the discretion of the Company. The following terms and conditions will govern your service to the Company:
>
> 1. You will the serve the Company on a full-time basis as a senior executive employee, and the Company will employ you as such, for a period of three years commencing November 1, 1992 and ending October 31, 1995 unless you are terminated at an earlier date pursuant to Paragraphs 6, 7, or 9 of this Agreement. Your annual salary will be $103,000 . . . . No later than six months prior to the expiration of the original term, or any renewal term, of this Agreement, it will be reviewed by the Company for the purpose of deciding whether or not it will be renewed upon its expiration. You will be notified of a decision not to renew. If you are not notified of a decision not to renew, the Agreement will automatically renew from year to year.
>
> *                    *                    *
>
> 7. In the event you voluntarily terminate your employment during the term of this Agreement, or if the Company terminates this Agreement and your employment for cause, your right to all compensation hereunder shall cease as of the date of termination. As used in this Agreement, "cause" shall mean dishonesty, gross negligence, or willful misconduct in the performance of your duties or a willful and material breach of this Agreement. Termination of employment shall terminate this Agreement with the exception of the provisions of Paragraphs 8, 9, 10, and 12.
>
> 8. Also in the event you voluntarily terminate your employment hereunder, or in the event the Company terminates this Agreement and your employment for cause you agree that for a period of two years after such termination, you will not compete, directly or indirectly, with the Company or with any division, subsidiary, or affiliate of the Company or participate as

---

[1] At all times relevant to this dispute, CEO was a wholly owned subsidiary of Gibson Greetings, Inc.

a director, officer, employee, consultant, advisor, partner, or joint venturer in any business engaged in the manufacture or sale of greeting cards, gift wrap, or other products produced by the Company, or by any division, subsidiary, or affiliate of the Company, without the Company's prior written consent.

9. In the event the Company terminates this Agreement and your employment without cause, you shall continue to be paid your then current salary from the date of termination through October 31, 1995.

In 1994, Cleo underwent some changes in its upper management. Jack Rohrbach replaced Michael Pietrangelo as the President of Cleo, and Marc English joined Cleo as its Senior Vice President of Marketing and Creative. On September 13, 1994, Cleo informed Guiliano that it would not renew his employment contract and that his employment would end on October 31, 1995. There is no evidence in the record that Cleo had any cause to terminate Guiliano. Jack Rohrbach later testified that he decided at about this time not to use Guiliano as Vice President of Marketing in the future. On September 28, 1994, Guiliano received a letter from Cleo informing him that he was "relieved of his duties as Vice President Marketing," that he was to receive any future assignments from the president of the company, and that he was to perform these assignments from home. The letter also advised Guiliano that he had no authority to bind, represent, or speak for Cleo in any manner. Rohrbach also testified that it was his opinion that Cleo did not have a Vice President of Marketing at this time. Instead, the majority of Guiliano's authority and responsibilities were assumed by Marc English. On November 3, 1994, Cleo sent Guiliano a letter informing him that he was not authorized to use any corporate credit cards and that he was to return these credit cards to Cleo. Guiliano later received another letter, dated November 17, informing him that as of December 1, 1994, Cleo would no longer answer a telephone line for him, that all calls would be screened to determine if they were of a business or personal nature, and that only the personal calls would be directed to Guiliano's home phone. The letter further informed Guiliano that he could retrieve only the personal names in his Rolodex because the business contacts were the property of Cleo. In an affidavit submitted in support of Guiliano, Jan Sobierski stated that upon placing a telephone call to Cleo and asking to speak to Guiliano, the receptionist said that Guiliano was no longer with the

3

company.[2] Guiliano did not receive any assignments from Cleo after September 28, 1994, but he received his full salary and benefits. On December 12, 1994, Guiliano accepted employment with Wang's International, Inc. (Wang's) at a salary of $110,000 a year.[3]

On January 26, 1995, Guiliano filed a complaint, alleging that Cleo "terminated" him without cause in breach of the Agreement. In this complaint, Guiliano avers that Cleo constructively terminated him when it reduced and removed his duties and that he is therefore entitled to damages. On March 29, 1995, Cleo filed its answer admitting that it relieved Guiliano of his duties as Vice President of Marketing, but denying that it constructively terminated him in breach of the Agreement. On January 5, 1996, Guiliano filed his Motion for Summary Judgment. On February 28, 1995, Cleo filed its Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment. After a hearing, the trial court entered an order on April 16, 1996 granting Guiliano's Motion for Summary Judgment and denying Cleo's Motion for Summary Judgment. The trial court awarded Guiliano his salary remaining under the contract, $90,125.00, plus $14,296.54 in prejudgment interest, for a total award of $104,421.54. Cleo appeals the trial court's decision.

On appeal, Cleo presents two issues for review as stated in its brief:

> 1. Did the trial court err in failing to grant defendant's Motion for Summary Judgment where defendant established that it did not terminate plaintiff, it did not breach the employment agreement with plaintiff, and there are no genuine issues of material fact?
>
> 2. Assuming, arguendo, that the trial court did not err in granting plaintiff's Motion for Summary Judgment, did the trial court err in holding that plaintiff was entitled to recover damages?

A trial court should grant a motion for summary judgment when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.03. The phrase "genuine issue" as stated in

---

[2] At the summary judgment hearing, Cleo insisted that this affidavit should be stricken on the grounds that the affidavit set forth facts that would not be admissible in evidence as required by Tenn. R. Civ. P. 56.05. We disagree. This is clearly an admission by an agent of Cleo that is against Cleo's interest, as argued by Guiliano, and would be admissible as such under the Tennessee Rules of Evidence 803(1.2)(D). In any event, there is ample other evidence to support our conclusion.

[3] Cleo makes much of the fact that Guiliano indicated that he was currently employed on his application to Wang's. This does not present a genuine issue of material fact. The issue in this case is whether the removal of Guiliano's duties was a constructive termination in breach of the contract, not whether Guiliano was actually terminated or whether he perceived that he had been terminated.

4

Rule 56.03 refers to genuine factual issues and does not include issues involving legal conclusions to be drawn from the facts. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). Because the material facts are undisputed here, we agree that granting summary judgment to one of the parties was proper. Therefore, we must decide whether the legal conclusions on which the trial court's grant of summary judgment was based are correct. Our review is *de novo* on the record with no presumption of the correctness of the trial court's conclusions of law. *Union Planters Nat'l Bank v. American Home Assurance Co.*, 865 S.W.2d 907, 912 (Tenn. App. 1993).

Cleo argues that the trial court erred in granting summary judgment in favor of Guiliano for two reasons. First, Cleo contends that the Agreement guarantees only that Cleo would employ Guiliano as a "senior executive employee," and not as its Vice President of Marketing. Second, Cleo argues that it did not breach the contract because the Agreement specifically states that Guiliano's functions and responsibilities were subject to change at its discretion. Instead, Cleo maintains that Guiliano voluntarily terminated his employment with Cleo when he accepted employment with Wang's.

This case centers on the construction of the employment contract. As this Court stated in *Park Place Center Enterprises, Inc. v. Park Place Mall Associates*, 836 S.W.2d 113 (Tenn. App. 1992):

> The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles. In construing contracts, the words expressing the parties' intentions should be given their usual, natural, and ordinary meaning. All provisions of a contract should be construed in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract. If the provisions are repugnant and cannot be reconciled, the first and principle clause is controlling and the subsequent provisions repugnant thereto are void and unenforceable.

*Id.* at 116 (citations omitted).

With the above well-established rules in mind, we will now examine the contract in dispute. The first clause in the Agreement provides that Guiliano is to serve as "Vice President, Marketing." Subsequent terms in the Agreement provide that Guiliano will serve Cleo as a "senior executive employee" or an "executive employee." To the extent that the term "Vice President, Marketing" conflicts with subsequent terms in the Agreement, the subsequent terms

are therefore void and unenforceable because they are repugnant to the first and principle term in the contract. *Id.* at 116. We find that Cleo hired Guiliano to be its Vice President of Marketing and now turn to whether Cleo breached the Agreement by removing all of Guiliano's duties in this capacity.

Cleo relies on *Canady v. Meharry Medical College*, 811 S.W.2d 902 (Tenn. App. 1991). In *Canady*, Meharry Medical College decided not renew the one-year contract of one its resident physicians and restricted the resident's duties for the remainder of his contract term. *Id.* at 904. The resident sued for breach of contract for the failure to renew his contract. *Id.* This Court held in favor of the medical college as to its failure to renew the contract. *Id.* at 906. The Court also addressed the restriction of the resident's duties, noting that the resident had no claim for breach of contract because there was no provision in his contract guaranteeing the he would he assigned particular duties. *Id.* at 904-05.

We find that Cleo's reliance on *Canady* is misplaced. In *Canady*, there is nothing to indicate that the contract called for the medical college to employ the plaintiff as anything but a resident. In this case, the Agreement guaranteed Guiliano employment as the Vice President of Marketing with all the prestige and authority that comes with such an executive title. In addition, the medical college in *Canady* merely restricted the resident's duties. It did not remove all of his duties in the position for which he was hired, as in this case.

Guiliano principally relies on one of our unpublished cases, *Smith v. American General Corp.*, No. 87-79-II, 1987 WL 15144 (Tenn. App. Aug. 5, 1987), for the proposition that a reduction in authority and responsibility can constitute a breach of an employment contract. In *Smith*, NTL Corporation hired Smith as its Executive Vice President of Investments and entered into an employment contract guaranteeing that Smith would be employed in "such employment or in a position of comparable responsibility." *Id.* at *1. Subsequently, American General Corporation acquired NTL and reduced Smith's authority and duties. *Id.* at *2. As a result of the changes in his authority, Smith resigned and sued for breach of his employment contract for the failure to employ him as promised. *Id.* On appeal, this Court stated that:

> Contrary to the insistence of defendant, such reduction in authority and responsibility did constitute a violation of the contract for which defendant was responsible in damages. Superficially it may be argued that an employee whose titular position and salary are continued has no basis for complaint as to

6

> reduction in work load. However, to those highly skilled and motivated employees who have the pride in their accomplishment and responsibility, salary is not the only remuneration for employment. To such employees, the loss of responsibility or authority is equal to or worse than loss of pay. Section 5 [the "comparable responsibility" provision] of the contract recognizes this situation and provides for it.
>
> Defendant cites authorities to the effect that changes in authority are not regarded as a breach of employment contract, however, the contract in the present case expressly guaranteed the continuation of existing duties and authority or a substitution of equivalent duties and authority. Whatever the general law on the subject, the provisions of the contract are controlling between the parties.

*Id.* at \*4. *Accord Lazenby v. American Gen. Corp.*, No. 89-67-II, 1989 WL 196244 (Tenn. App. Sept. 13, 1989) (holding that an employer breached an employment contract with a "comparable responsibility" provision when it reduced an employee's duties).

Cleo argues that *Smith* is distinguishable because the Agreement in this case does not contain a provision guaranteeing Guiliano employment in a position of "comparable responsibility." To the contrary, Cleo points out that the Agreement specifically provides that Guiliano's functions and responsibilities are subject to change at its discretion.

We agree with the Cleo that the Agreement is distinguishable from the employment contract in *Smith* because of the absence of a "comparable responsibility" provision. Even without such a provision, however, Cleo was under a duty to act fairly and in good faith when exercising its right to change Guiliano's functions and responsibilities as its Vice President of Marketing. As stated in *TSC Industries, Inc. v. Tomlin*, 743 S.W.2d 169 (Tenn. App. 1987):

> It is true that there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement, and a person is presumed to know the law. *See* Restatement (2d) Contracts, § 205 (1979). What this duty consists of, however, depends upon the individual contract in each case. In construing contracts, courts look to the language of the instrument and to the intention of the parties, and impose a construction which is fair and reasonable. *See, e.g., Covington v. Robinson*, 723 S.W.2d 643, 645-6 (Tenn. App.1986).

*TSC Industries,* 743 S.W.2d at 173.

We do not believe that it is a fair and reasonable construction of the contract to say that the parties intended Guiliano to serve as Vice President of Marketing in name only and to sit at home and do nothing until the term of the Agreement expired. Our conclusion is supported by the testimony of Michael Pietrangelo, the former President and Chief Executive Officer of Cleo:

> In my opinion, Tony was -- this document said you are Vice President of Marketing for the next three years, and that meant that you perform as Vice President of Marketing. Whether or not we add or take away responsibilities could be, for example, are going to put the art department under you, or going to take everyday gift wrap out from under you, but you are still the Vice President of Marketing.

Although the Agreement certainly contemplated a reasonable "change" in Guiliano's functions and responsibilities, it did not contemplate the complete removal of his functions and responsibilities so that his position was rendered a virtual nullity. *Accord McLaughlin v. Union Leader Corp.*, 116 A.2d 489, 493 (N.H. 1955); *see also Rudman v. Cowles Communications, Inc.*, 280 N.E.2d 867, 872 (N.Y. App. 1972) (holding that an employer could not discharge employee for refusing to perform assignments that were inconsistent with the executive position called for in the contract, even though the assignments were at the company's discretion). Therefore, we hold that Guiliano was entitled to treat his employment as terminated and the contract as breached when Cleo relieved him of all of his duties and responsibilities as Vice President of Marketing.

In the second issue, Cleo argues that the trial court erred in awarding damages because Guiliano accepted a position with Wang's at a higher salary and did not suffer any actual harm. Alternatively, Cleo argues that the provision is a liquidated damages provision that is unenforceable because it is a penalty. Guiliano, on the other hand, argues that the provision in the Agreement is a severance pay provision. Even if the provision is construed to be a liquidated damages provision, Guiliano argues that it is not a penalty.

Paragraph nine of the Agreement stipulates that if Cleo terminates Guiliano without cause, Guiliano is entitled to be paid his current salary from the date of termination to the date of the expiration of the Agreement. It appears to the Court that whatever label or title we put on this particular provision of the contract, it is a provision calling for payment of a sum certain in the event of a certain occasion. This is, in effect, a liquidated damages provision, which is a sum stipulated by the parties in the contract to be paid to compensate for injuries in the event of a breach. *See V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd., Inc.*, 595 S.W.2d 474, 484 (Tenn. 1980).

Liquidated damages provisions must be reasonable in relation to the terms of the contract and the certainty with which damages can be measured. *McGann v. United Safari, Inc.*, 694

8

S.W.2d 332, 336 (Tenn. App. 1985). There must be a reasonable relationship between the amount stipulated as liquidated damages and what might reasonably be expected in the event of a breach. *Id.* (citing *V.L. Nicholson Co.,* 595 S.W.2d at 484). Whether a provision for liquidated damages is reasonable is determined prospectively, at the time that the parties entered into the contract, rather than retrospectively. *Kendrick v. Alexander*, 844 S.W.2d 187, 191 (Tenn. App.1992).

Even if the liquidated damages provision is reasonable at the time of contracting, recovery will be limited to actual damages if the amount stipulated as liquidated damages is so greatly in excess of actual damages that it is, in effect, a penalty. *Beasley v. Horrell*, 864 S.W.2d 45, 50 (Tenn. App. 1993); *Harmon v. Eggers*, 699 S.W.2d 159, 163 (Tenn. App. 1985). Because forfeitures and penalties are not favored, any doubt as to whether a sum is a penalty or liquidated damages will generally be resolved as the former. *Beasley*, 864 S.W.2d at 50; *Harmon*, 699 S.W.2d at 163.

In *Norwalk Door Closer Co. v. Eagle Lock & Screw Co.*, 220 A.2d 263 (Conn. 1966), the Court said:

> The circumstances which the parties might reasonably foresee at the time of making a contract could, in any given case, be vastly different from the circumstances which actually exist when a court is called upon to enforce the contract. It is not the function of the court to determine by hindsight the reasonableness of the expectation of the parties at the time the contract was made, but it is the function of the court at the time of enforcement to do justice. In the ordinary contract action the court determines the just damages from evidence offered. In a valid contract for liquidated damages, the parties are permitted, in order to avoid the uncertainties and time-consuming effort involved, to estimate in advance the reasonably probable foreseeable damages which would arise in the event of a default. Implicit in the transaction is the premise that the sum agreed upon will be within the fair range of those just damages which would be called for and provable had the parties resorted to proof. ***Consequently, if the damage envisioned by the parties never occurs, the whole premise for their agreed estimate vanishes, and, even if the contract was to be construed as one for liquidated damages rather than one for a penalty, neither justice nor the intent of the parties is served by enforcement. To enforce it would amount in reality to the infliction of a penalty.***

*Id*. at 268 (emphasis added) (citations omitted). The *Norwalk* opinion is well reasoned and conforms to this Court's perception of the law in this jurisdiction.

In this case, although Guiliano was able to secure employment with Wang's at a higher

9

salary, this was not certain at the time the parties entered into the contract. Rather, it was within the fair contemplation of the parties that, if Guiliano was terminated without cause, he would not be able to find a comparable position at the same salary or that he would suffer damages that would be difficult to prove, such as a loss of status or prestige or a loss of advancement opportunities. Therefore, the liquidated damages provision was reasonable at the time the contract was entered into in terms of what might have been anticipated in the event of a breach.

Nonetheless, there is no proof in the record that Guiliano suffered *any* actual harm as a result of the breach. The record indicates that Guiliano was not only able to find comparable employment, but that he found employment at a higher salary. Moreover, he presented no proof whatsoever as to any loss of prestige, status, advancement opportunities, or other damages. In fact, the record shows that Guiliano did not even suffer a loss in pay between positions. Under these facts, we conclude that the liquidated damages provision, which would allow Guiliano a recovery of $90,125.00, plus interest, is grossly disproportionate in light of the fact that he suffered no actual harm. The purpose of a liquidated damages provision is not to provide a party with a windfall. Therefore, the liquidated damages provision in this case is unenforceable as a penalty.

Accordingly, the judgment of the trial court is reversed, and this case is remanded for such further proceedings as are necessary. Costs of appeal are assessed against the appellee.

_____
**W. FRANK CRAWFORD,**
**PRESIDING JUDGE, W.S.**

**CONCUR:**

_____
**ALAN E. HIGHERS, JUDGE**

_____
**HEWITT P. TOMLIN, JR., SENIOR JUDGE**