IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 18, 2002 Session

## LARRY V. BULLOCK, C.P.A. v. CHARLES SPELL, D.D.S., ET AL.

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-006092-00     D'Army Bailey, Judge**

---

**No. W2002-00053-COA-R3-CV - Filed June 16, 2003**

---

This appeal arises from a contract dispute. The trial court, finding that Mr. Bullock had substantially complied with the contract provisions and that he did not repudiate the contract, entered judgment in his favor. The court awarded damages based on breach of contract, including attorney fees and additional damages. The parties raise multiple issues on appeal. For the following reasons, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY KIRBY LILLARD, J., joined.

Robert L. J. Spence, David M. Di Scenza, Memphis, TN, for Appellant

James A. Johnson, Jr., Memphis, TN, for Appellee

### OPINION

### Facts and Procedural History

In October of 1999, Dr. Charles Spell ("Dr. Spell") contacted Larry Bullock ("Mr. Bullock") regarding accounting services. In the course of these services, Mr. Bullock became aware that Dr. Spell was interested in purchasing some commercial property. Subsequently, Dr. Spell and Mr. Bullock entered into a Consulting Agreement ("Agreement") in which Mr. Bullock was to provide certain consulting services, including aiding Dr. Spell in obtaining the required financing for the property acquisition.

The Agreement provided that Dr Spell would pay Mr. Bullock "simultaneously with the closing of the arranged financing and from the proceeds thereof, the sum determined by the schedule below <u>minus</u> an unconditional, non-refundable retainer in the amount of <u>$1,500</u> due and payable

upon the signing of this agreement." The schedule indicated that Mr. Bullock would be entitled to two point five percent (2.5%) of the amount of financing if the amount of financing was over $500,000.00. The agreement further provided that "[i]f financing is not achieved, [Dr. Spell] shall owe no additional fees and all prior services rendered by [Mr. Bullock] shall be deemed paid in full." The Agreement was effective for two years and stated that any and all financing received by Dr. Spell in this time frame would be subject to the terms of the Agreement.

After the Agreement was signed, Mr. Bullock compiled a Request for Financing and began negotiations with Bancorp South ("BCS"). Thereafter, BCS issued a loan commitment letter and an amended loan commitment letter. On November 19, 1999, Mr. Bullock sent Dr. Spell a letter outlining the financing proposal of BCS. (Exhibit B30). Mr. Bullock had arranged for BCS to loan Dr. Spell $1,975,000.00 for the purchase and re-financing plus a $100,000 line of credit. The letter also stated that Dr. Spell would incur other charges relating to closing fees and Mr. Bullock's fees. On November 23, 1999, Dr. Spell and Mr. Bullock met with BCS to discuss the proposed loan financing. At the close of the meeting, Dr. Spell informed Mr. Bullock that he needed until after the holidays to think about the proposed plan. The loan commitment from BCS was to expire on November 29, 2001.

During this time, Mr. Bullock tried to reach Dr. Spell by telephone on several occasions, but his calls were unreturned by Dr. Spell. In fact, Dr. Spell did not contact Mr. Bullock prior to the November 29 deadline. On December 1, 1999, after fruitless attempts at reaching Dr. Spell by telephone and in person, Mr. Bullock wrote Dr. Spell a letter which stated in part, "I prefer we abrogate this relationship now. My plans are to bill you for the work performed regarding your bookkeeping, payroll, and tax preparation fees. And, due to untimeliness of your support of this transaction I plan on submitting our Consulting Agreement to my attorney to pursue legal actions." Subsequently, Dr. Spell, using the financing application binder prepared by Mr. Bullock, sought and received financing from National Bank of Commerce ("NBC").

After Dr. Spell obtained financing from NBC, Mr. Bullock brought suit in circuit court seeking monetary damages for breach of contract (the Agreement) alleging that he fully performed and was therefore entitled to compensation for services rendered. In the alternative, Mr. Bullock claimed that he was entitled to recover under a theory of quantum meruit. Dr. Spell answered, denying that he had breached the contract.

The trial was held on December 5, 2001. In its order dated December 14, 2001, the court found that Dr. Spell "owed a reciprocal contractual obligation of good faith to Mr. Bullock to advise him that he did not like the lending proposal . . . , and that he wanted, and would allow, Mr. Bullock to keep working on his contract and find a more suitable arrangement." The court further found that Dr. Spell refused Mr. Bullock's "telephone calls, locked the doors, and sealed off all communication from Mr. Bullock," allowing the loan commitments to expire without advising Mr. Bullock of his concerns. The court also found that Dr. Spell's "actions were not done in good faith and prevented Mr. Bullock from being able to perform the contract any further."

The court further found that Mr. Bullock substantially complied with his contract duties and that Mr. Bullock's December 1, 1999 letter was not a repudiation of the contract. In regard to the letter dated December 1, the court stated that "[u]nder the circumstances, the Court does not know that Plaintiff could have done anything else." In addition, the court found that:

> the issue isn't whether Dr. Spell was obligated to go through with the Bancorp South loan commitment that was presented to him through Plaintiff's efforts. Rather, the issue involves what happened after the commitment was issued. Dr. Spell used Mr. Bullock's work product as the basis for his later loan application to National Bank of Commerce ("NBC"). There's no question about that under the proof. Dr. Spell took the Request for Financing (Exhibit D) to them. He in effect told NBC that it could use "whatever of this document you want out of it. I paid for it." The Court is of the opinion that he had not paid for it. The $1,500.00 dollar deposit that Dr. Spell paid the Plaintiff, as shown by the proof in this case, would not have fully paid for the work that had been provided by Plaintiff.

The court concluded that "it would be unjust, inequitable, and not lawful for the Plaintiff not to be compensated and compensated properly for the work that he provided to Dr. Spell." The court found that correspondence from Mr. Bullock to Dr. Spell "set forth that he expected separate payment" and that "there was no evidence of objection by Dr. Spell to the Plaintiff's expectation of separate payment as provided by the Contract (Exhibit B-4) and the other correspondence." Thus, the court entered judgment in favor of Mr. Bullock, awarding him $26,000.00 as the amount of fee due under the Agreement, $2,550.00 for other accounting services unrelated to the Agreement, and an award of $8,666.67 as a reasonable attorney fee allowed under the Agreement. Dr. Spell now appeals this judgment raising the following issues.

### Issues

I.      Whether the trial court erred in failing to interpret the contract by its terms and in finding that Appellee did not repudiate the contract.

II.     Whether the Appellee is entitled to recover damages under the theory of quantum meruit.

III.    Whether the trial court erred in awarding Appellee damages for accounting services which were not pled.

### Standard of Review

The findings of fact made by a trial court are given a presumption of correctness that will not be overturned unless the evidence preponderates against those findings. See TENN. R. APP. P. 13(d); see also Bank/First Citizens v. Citizens and Assoc., 82 S.W.3d 259, 262 (Tenn. 2002). A trial court's ruling on a matter of law, however, will be reviewed "'under a pure *de novo* standard . . . according no deference to the conclusions of law made by the lower court[].'" Bank/First Citizens,

82 S.W.3d at 727 (quoting <u>Southern Constructors, Inc. v. Loudon County Bd. of Educ</u>., 58 S.W.3d 706, 710 (Tenn. 2001)). With respect to the issues relating to the interpretation of the contact, "[t]he interpretation of a written agreement is a matter of law and not of fact, therefore, our review is de novo on the record with no presumption of the correctness of the trial court's conclusions of law." <u>Inscoe v. Kemper</u>, No. M1999-00741-COA-R3-CV, 2000 WL 1657844, at *2 (Tenn. Ct. App. Nov. 6, 2000) (citing <u>Union Planter's Nat'l Bank v. American Home Assurance Co.</u>, 865 S.W.2d 907, 912 (Tenn. Ct. App. 1993)).

## Law and Analysis

### *Breach of Contract*

In his first issue, Dr. Spell argues that there were two separate occasions where Mr. Bullock refused to perform the contract by its terms. In his first contention, Dr. Spell claims that Mr. Bullock made a unilateral amendment regarding the fee provision and that this constituted a breach or an expressed desire not to perform under the contract terms, thus excusing Dr. Spell's performance. In his second contention, Dr. Spell asserts that Mr. Bullock repudiated the contract by his letter dated December 1, 1999 which stated "I prefer we abrogate this relationship now."

Mr. Bullock argues that there was not a material change in the agreement and that the contract is valid and was fully performed by Mr. Bullock. In the alternative, Mr. Bullock argues that he is entitled to damages even if there had been a unilateral change in the contract because Dr. Spell waived any objection by accepting Mr. Bullock's performance. Also, Mr. Bullock argues that Dr. Spell's claim that Mr. Bullock failed to give exact performance under the contract is barred. Specifically, Mr. Bullock alleges that Dr. Spell failed to plead the substantial variance of the contract performance as an affirmative defense and thus cannot now raise this on appeal.

When interpreting a contract term, the court should "ascertain the intention of the parties and . . . give effect to that intention as best can be done consistent with legal principles." <u>Petty v. Sloan</u>, 277 S.W.2d 355, 360 (Tenn. 1955) (citations omitted). "In getting at this intention we of course do not determine what the state of mind was of the parties at the time the contract was executed but rather what their intention was as actually embodied and expressed in the instrument as written." <u>Petty</u>, 277 S.W.2d at 360.

The controversy of the parties revolves around the interpretation of the following excerpt from the Consulting Agreement:

> THE CLIENT will pay to Representative simultaneously with the closing of the arranged financing and from the proceeds thereof, the sum determined by the schedule below <u>minus</u> an unconditional, non-refundable retainer in the amount of $1,500 due and payable upon the signing of this agreement.

Dr. Spell claims that he first discovered Mr. Bullock's attempt to unilaterally amend the Agreement when he received the November 19, 1999 letter from Mr. Bullock. In the letter, Mr. Bullock advised

-4-

Dr. Spell that he would receive $1,975,000 for the purchase and refinancing and a $100,000 line of credit. The letter also stated that Dr. Spell would incur other charges relating to closing fees and his fees. Dr. Spell maintains that Mr. Bullock did not provide him with a financing plan that comported with the terms of the Agreement because the proposed plan required that Dr. Spell have out of pocket costs at closing.

In our view, the Agreement provides that Mr. Bullock's fees will be paid at closing and that he is entitled to 2.5% of the obtained financing. The language "and from the proceeds thereof" cannot be interpreted to mean that Dr. Spell would have no out of pocket costs. If Dr. Spell had wanted 100% financing and a no cost closing, he could and should have put these provisions into the contract in no uncertain terms. If a word or phrase is to be given "a restricted or limited meaning so as to exclude certain things and include others that then the contract, for it to have such a restricted or limited meaning, should go further and so state in unmistakable terms." Petty, 277 S.W.2d at 360. Because this provision simply cannot be construed as Dr. Spell insists, Mr. Bullock's November 19, 1999 letter, stating that other costs included closing fees and his fees, cannot be seen as an attempt to amend the Agreement. As our Supreme Court has previously recognized, "[i]t is the function of a court to interpret and enforce contracts as they are written, notwithstanding they may contain terms which may be thought harsh and unjust. A court is not at liberty to make a new contract for parties who have spoken for themselves." Petty v. Sloan, 277 S.W.2d 355, 359 (Tenn. 1955) (citing Smithart v. John Hancock Mutual Life Ins. Co., 167 Tenn. 513, 525, 71 S.W.2d 1059, 1063).

We next turn to Dr. Spell's contention that Mr. Bullock repudiated the Agreement by his letter dated December 1, 1999. The letter stated in pertinent part:

> I prefer we abrogate this relationship now. My plans are to bill you for the work performed regarding your bookkeeping, payroll, and tax preparation fees. And, due to untimeliness of your support of this transaction I plan on submitting our Consulting Agreement to my attorney to pursue legal actions.

The trial court found that this letter demonstrated that Mr. Bullock wanted to end their accounting relationship and to notify Dr. Spell that he was not happy with the way the transaction "went down" and that he was "going to talk to his lawyer about what was owed for all of this work that he did." The court also found that Dr. Spell had every right to question whether or not he wanted to accept the proposed loan, but that he owed Mr. Bullock a duty of good faith "to advise him that he did not like the lending proposal presented by Plaintiff, and that he wanted, and would allow, Mr. Bullock to keep working on his contract and find a more suitable arrangement." Instead, "Dr. Spell refused Plaintiff's telephone calls, locked the doors, and sealed off all communication from Mr. Bullock" without informing Mr. Bullock or BCS of his concerns. The court further found that Dr. Spell's actions "were not done in good faith and prevented Mr. Bullock from being able to perform the contract any further." In reference to Mr. Bullock's December 1 letter, the court concluded that "under the circumstances, the Court does not know that Plaintiff could have done anything else."

As this Court has previously held, there is "implied in every contract a duty of good faith and fair dealing in its performance and enforcement." TSC Industries, Inc. v. Tomlin, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 (1979)). The extent of this duty depends on the contract itself. Id. "In construing contracts, courts look to the language of the instrument and the intention of the parties, and impose a construction which is fair and reasonable." Id. (citing Covington v. Robinson, 723 S.W.2d 643, 645-646 (Tenn. Ct. App. 1986)). After carefully reviewing the record, we find no error in the trial court's determinations that Dr. Spell did not act in good faith and that his actions hindered Mr. Bullock from further performance and that, under the circumstances, Mr. Bullock was justified in sending the December 1 letter. Therefore, we affirm the trial court.

### Quantum Meriut

Our disposition of the first issue renders moot any discussion of this issue.

### Unpled Accounting Fees

In his remaining issue, Dr. Spell argues that Mr. Bullock is not entitled to damages for unpaid accounting services unrelated to the Agreement because they were not pled. Our review of the record indicates that Mr. Bullock introduced an invoice detailing charges for accounting services which were unrelated to the consulting agreement and were not mentioned in the pleadings. Mr. Bullock testified that Dr. Spell still owed him the amounts listed on the invoice and that Dr. Spell has made no payment on these items. Counsel for Dr. Spell objected to the introduction of such evidence on the ground that the complaint did not seek relief for these charges. Counsel for Mr. Bullock responded that he thought these charges were pled in the complaint, but that he would have to check. The court did not rule on the objection either way and counsel for Mr. Bullock then moved on to other matters.

At the close of his proof, counsel for Mr. Bullock made a motion to amend the pleadings to conform to the proof and also stated that "I may need to renew that at the end of the entire case." In response, the trial court stated "[w]hy don't we wait until the end of the case." A review of the record shows that Mr. Bullock never renewed his motion to amend. The next time the issue was mentioned was in the trial court's ruling from the bench, wherein the trial court stated that it was "going to allow an amendment to conform to the evidence since there is no dispute but that these other charges of accounting services are unrelated to this contract, but it's been put into evidence that they're due and owing and it hasn't been contradicted by the proof."

Dr. Spell argues that because Mr. Bullock did not renew his motion to amend, he should not have been allowed to recover damages for the accounting services. We disagree. Tennessee Rule of Civil Procedure 15.02 provides as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to

the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. Provided, however, amendment after verdict so as to increase the amount sued for in the action shall not be permitted. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice that party in maintaining the action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

TENN. R. CIV. P. 15.02. As stated in Rule 15.02, such a motion may be made at any time. The Rule "abrogates the time factor by providing that 'failure to so amend does not affect the result of the trial of these issues.' Because of this provision, 'the timing of the motion to conform is of little moment.'" Zach Cheek Builders, Inc. v. McLeod, 597 S.W.2d 888, 890 (Tenn. 1980) (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1494, at 475 (1971)).

Mr. Bullock made a motion to amend and nothing in Rule 15.02 requires that this motion be made at any particular time nor is there a requirement that such a motion be renewed. See TENN. R. CIV. P. 15.02. As such, we find that the trial court did not abuse its discretion.

### Conclusion

Accordingly, we affirm. Costs on appeal are taxed to the Appellant, Dr. Charles Spell, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, JUDGE