**JONES COMPANY CUSTOM HOMES OF TENNESSEE, INC., Plaintiff/Respondent,**

v.

**COMMERCE BANK, N.A. and Lawyers Title Insurance Corp., Defendants,**

**and**

**The Carothers Development Partnership, Defendant/Appellant.**

No. ED 81633.

Missouri Court of Appeals, Eastern District, Division Five.

Aug. 12, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 24, 2003.

---

Thomas E. Wack, Elizabeth C. Carver, St. Louis, MO, for appellant.

J. Vincent Keady, Jr., Barry L. Haith, St. Louis, MO, for respondent.

LAWRENCE G. CRAHAN, Judge.

The Carothers Development Partnership ("Seller") appeals the judgment enjoining payment of a letter of credit in its favor. We reverse and remand.

Seller owned a 143 acre tract in Franklin, Tennessee. Seller held the property as a land speculator with the intention of ultimately selling it to a third party for development. Jones Company Custom Homes of Tennessee, Inc., ("Buyer") owned an adjacent parcel of land on which it was constructing a residential community known as McKay's Mill. On July 24, 2000, Buyer and Seller entered into a Land Purchase Agreement ("Agreement") pursuant to which Buyer agreed to construct on Seller's property a road known as the New Liberty Pike Extension and to install sewer, water, electric, and gas lines and conduit. In exchange, Seller agreed to convey to Buyer a portion of its property. The amount of property to be conveyed was to be determined based on the cost Buyer incurred in constructing the improvements. Construction of the road provided Buyer with better access to its residential community and would make Seller's remaining property more desirable to potential developers. The agreement called for a closing no later than October 15, 2000.

Prior to the scheduled closing, one of the partners who owned Seller learned that the City of Franklin had put a hold on additional sewer connections because the existing main sewer line that served the area was at or near capacity. The partner so informed Dan Crunk, Buyer's engineer. The parties then negotiated and signed an amendment to the Agreement dated October 10, 2000 ("Amendment"). In pertinent part, the Amendment provided:

WHEREAS, after the Agreement was executed the parties learned that the City of Franklin ("the City") will not permit the sewer lines to be installed until the sewer main (the "Sewer Main") that would serve the Sewer Lines is enlarged and upgraded by the City; and

WHEREAS, the parties nevertheless wish to proceed with the transaction contemplated by the Agreement,

NOW, THEREFORE, the parties agree as follows:

1. Purchaser will construct the Road without installing the Sewer Lines.

2. Seller will be solely responsible for installing the Sewer Line......

The Amendment extended the closing date until November 1, 2000, and provided

that Buyer would "deposit $300,000 in cash or by an irrevocable letter of credit reasonably satisfactory to Seller (the 'Sewer Deposit') with Lawyers Title Insurance Corporation." Lawyers Title was directed to hold the Sewer Deposit until the first to occur of the following events:

(i) The City's permitting Seller to install the Sewer Lines and to connect the Sewer Lines to the Sewer Main; or

(ii) March 31, 2002.

Pursuant to the Amendment, if the City's permission to install and connect the Sewer Lines occurred before March 31, 2002, and the parties so certified to Lawyers Title, Lawyers Title was to return the Sewer Deposit to Buyer. Conversely, if Seller certified to Lawyers Title that such permission was not received by March 31, 2002, Lawyers Title was directed to deliver the proceeds of the letter of credit to Seller. In all other respects, the Agreement remained in full force and effect.

After the parties executed the Amendment on October 10, 2000, they learned that the City had imposed a formal moratorium on grants of new sewer availability. On July 10, 2001, the City's Mayor and Board of Alderman ("Board") approved a motion that no new sewer availability would be granted for the Watson Branch Interceptor Sewer Line serving the area in question until a new gravity flow line was installed next to it, expanding the capacity. Later, on October 9, 2001, the Board adopted a more formal, written resolution, clarifying the policy adopted on July 10, 2001. According to the October 9, 2001 resolution, after its action on July 10, 2001, the City had received a number of requests for sewer service on the Watson Branch Line from residents or contractors who claimed a prior contractual or other vested right to sewer service and/or that there was sufficient capacity within the line to accommodate their developments,

or both. The resolution reconfirmed the Board's previous finding that the Watson Branch Line was flowing at or near capacity and its policy that no new sewer connections would be granted until completion of the new line, which was anticipated to be June 1, 2003. However, the Board adopted limited exceptions to the policy to accommodate those claiming to have acquired a vested right prior to July 10, 2001. Specifically, new sewer installations could be completed if: (1) The City water and wastewater Director and the City of Engineer agreed that the development would not materially add to the flow of the Watson Branch Line; and (2) either a written request or site plan had been submitted or availability had been granted prior to July 10, 2001.

Seller had neither requested nor been granted sewer availability prior to July 10, 2001. Nor had it submitted a site plan prior to that date. To do so, Seller would have had to have submitted a statement regarding the expected sewer discharge capacity for the project in question and a site plan. Inasmuch as Seller did not intend to develop the property itself and had not yet found a buyer from which it could ascertain its plans for development, Seller was not in a position to do either. No representative of Buyer ever requested that Seller apply for a permit and Seller did not do so. On April 9, 2002, the Assistant Director of City's Waste and Wastewater Department wrote to Seller confirming the resolution and stating that construction of the sewer main expansion had a scheduled start date of March 1, 2002. The contact called for completion of the expansion within 18 months.

On April 2, 2002, Seller certified to Lawyers Title that "the City of Franklin, Tennessee did not permit [Seller] to install and connect the Sewer Lines (as defined in Land Purchase Agreement, as amended,

between the above referenced parties) to the City's sewer main prior to March 31, 2002." The following day, Buyer filed the instant suit seeking to enjoin Seller, Lawyers Title and Commerce Bank, which issued the letter of credit, from drawing on or paying out the letter of credit. Buyer claimed that Seller had breached the agreement by failing to make a good faith effort to procure the City's permission to connect the sewer line to the sewer main and therefore was not entitled to draw upon the letter of credit as provided in the amendment. The trial court issued a temporary restraining order and the hearings on the request for a temporary and permanent injunction were consolidated for trial. After post-hearing briefing, the trial court entered its judgment permanently enjoining Seller from drawing on the letter of credit, enjoining Lawyers Title and the bank from paying out or drawing on it, and ordering Lawyers Title to return the letter of credit to Buyer. The trial court held that, under the duty of good faith and fair dealing imposed by Tennessee law, Seller was required to at least attempt to obtain a permit from the City of Franklin. The trial court further found that Seller had suffered no damages because it had neither attempted to sell nor develop the property. According to the court, to require any less of Seller would result in a windfall, which was not the parties' intent. After denial of its motion to set aside the judgment, Seller appealed.

■■■ In its first point, Seller maintains the trial court erred in interpreting the Agreement, and more particularly, the Amendment, to require Seller to seek a permit as a condition of receiving payment of Buyer's letter of credit because the agreement did not, by its terms, require Seller to seek a permit and, in any event, an attempt to obtain a permit would have been futile because of the moratorium imposed by the City of Franklin. On review of the court tried case, we must sustain the judgment of the trial court unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. 1976). We must accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Holbert v. Whitaker*, 87 S.W.3d 360, 362 (Mo.App.2002). Interpretation of a contract, however, is a question of law that we review *de novo*. *Id.*

The parties agree that, by virtue of an express provision in their Agreement, their rights and obligations under the Agreement are to be governed by the laws of Tennessee. *Warren v. Metropolitan Gov't*, 955 S.W.2d 618, 622–23 (Tenn.App. 1997), summarized Tennessee law with respect to interpretation of contracts:

> Courts are to interpret and enforce the contract as written, according to its plain terms. We are precluded from making new contracts for the parties by adding or deleting provisions. When clear contract language reveals the intent of the parties, there is no need to apply rules of construction.... A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one; a strained construction may not be placed on the language used to find an ambiguity where none exists. We are to consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. If a contract is plain and unambiguous, the meaning thereof is a question of law for the court. (internal citations omitted).

Although the dispute in this case concerns the proper interpretation of the parties' obligations under the Amendment, the Amendment must be viewed in the context

of the original Agreement it modified. Pursuant to the original Agreement, Buyer was to construct a road across Seller's property, along with sewer, water, electric, and gas lines and conduit. Buyer's only interest was the roadway itself. The utilities, sewer and other improvements would ultimately be utilized by the developer of Seller's property. Buyer was to finance all of the construction and would then be reimbursed by Seller in the form of land, which the parties valued at $108,900.00 per acre. Thus, in exchange for about 35 acres of land, Seller was to obtain improvements that would render the property ready for immediate development without spending any additional cash. Buyer would gain improved access to its residential development plus valuable land to compensate it for the expenses incurred to build the improvements.

When the parties learned prior to closing that the City would not permit the sewer lines to be installed until the sewer main was enlarged and upgraded, the parties were confronted with two problems. First, under the Agreement, Buyer was required to complete construction by August 15, 2001, yet construction of the new sewer main was not then expected to be completed until the first quarter of 2002. Second, if completion of the new sewer main was delayed even further, Buyer would still be getting everything it had coming under the Agreement but Seller would not. Even with the new road, Seller could not market the property as ready for immediate development until the new sewer main was completed, an event beyond the parties' control.

Seller demanded additional compensation in the form of a $300,000.00 letter of credit, payable in the event Seller could not obtain sewer permits and hook up to the sewer main by March 31, 2002, which was apparently the date the City was then anticipating completion of the expansion of the sewer main. Seller would be solely responsible for constructing the sewer line, which had the effect of correspondingly reducing the number of acres to be transferred to Buyer. Buyer acceded to Seller's demand and signed the agreement.

■■■ The trial court correctly found that Tennessee law imposes a duty of good faith and fair dealing in the performance and enforcement of contracts. *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn. App.1986). However, "in determining whether the parties acted in good faith in the performance of a contract, the court must judge the performance against the intent of the parties as determined by a reasonable and fair construction of the language of the instrument." *Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn.1996). Accordingly, under Tennessee law, "the common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties." *Id.* at 687.

At trial and on appeal, Buyer relied on *Covington* for the proposition that Seller was required to seek a sewer permit despite the City's moratorium on permits. In *Covington*, prospective purchasers of farmland sought return of their earnest money due to their failure to obtain a loan of at least 75% of the purchase price as provided in a financing contingency clause. 723 S.W.2d at 644. The purchasers had received approval from the Federal Land Bank for a loan amounting to 73.98% of the purchase price. *Id.* However, the amount of the loan was the amount the purchasers had requested and they had never informed the bank of the 75% financing contingency. *Id.* at 646. Moreover, the purchasers refused an offer from sellers to reduce the purchase price to bring the loan within the 75% contingency. *Id.* Despite purchaser's claim that the loan

they obtained was the maximum the bank would approve, the court held that the evidence was sufficient to support a finding that the purchasers had not shown reasonable diligence or good faith. *Id.* The court pointed out that there was no evidence that the purchasers knew at the time they refused to close that no greater amount would have been approved, having never informed the bank of the need for a slightly greater amount. *Id.*

*Covington* is clearly distinguishable from the instant case. In *Covington,* the purchasers failed to show that they could not have gotten a loan in the requisite amount. In the instant case, there was no uncertainty about Seller's ability to obtain a permit before the sewer main upgrade was complete. The parties explicitly agreed in the Amendment that "the City of Franklin . . . will not permit the sewer lines to be installed until the sewer main . . . is enlarged and upgraded." The only contingency was when that work would be complete. The parties allocated that risk by their Agreement that if Seller was able to install and connect its sewer lines to the sewer main before March 31, 2002, Buyer would get its $300,000.00 letter of credit back. If not, the money belonged to Seller. Because the City's upgrade of the sewer main was nowhere near completion as of March 31, 2002, Seller was entitled to the funds in question.

In its brief, Buyer draws our attention to evidence that a limited number of sewer permits were granted after the moratorium was passed. However, these permits were for very small, isolated projects that were "in the pipeline" prior to July 10, 2001, and thus fell within the exceptions to the moratorium set forth in the resolution. Buyer also points out that the Board had theoretical power to override the moratorium. However, Buyer offered neither evidence nor a plausible argument as to why the Board would do so in light of the serious concern over possible system overflow set forth in the resolution. Indeed, every one of the City witnesses called by Buyer expressed the view that any application submitted after July 10, 2001, would have been denied.

More importantly, however, these arguments overlook the fact that, under Tennessee law, the common law duty of good faith does not extend beyond the agreed terms of the contract and the reasonable contractual expectations of the parties. *Wallace,* 938 S.W.2d at 687. Given the parties explicit agreement in the Amendment that the City would not permit the sewer lines to be installed until the sewer main was enlarged and upgraded, Buyer could have no reasonable contractual expectation that Seller had any obligation to apply for a permit before the work on the sewer main was completed.

 Contrary to the trial court's conclusion in its judgment, the $300,000.00 payment due Seller does not represent a windfall. It is additional consideration negotiated by the parties in an arms-length transaction designed to compensate for the fact that Seller would not receive the immediate benefits it would otherwise have received under the original Agreement. Buyer's argument that it represents an unenforceable penalty is not supported by the evidence and was neither pleaded nor argued at trial. Arguments not presented to the court below are not preserved for appeal. *State v. Sims,* 952 S.W.2d 286, 293 (Mo.App.1997).

Based on the foregoing, we hold that the trial court misapplied Tennessee law in holding that Seller breached its common law duty of good faith in failing to apply for a sewer permit before the upgrade of the sewer main. Accordingly, we reverse the judgment and remand for entry of judgment in favor of Seller.

 In its final point, Seller claims that, because it should be the prevailing

party in this litigation, it is entitled to judgment for its reasonable attorney's fees and court costs as provided in the contract. Tennessee law is clear that when a contract provides for a reasonable attorney's fee "[t]he parties are entitled to have their contract enforced according to its express terms." *Wilson Mgmt. Co. v. Star Distribs. Co.*, 745 S.W.2d 870, 873 (Tenn.1988). In light of its erroneous disposition, the trial court never reached Seller's claim for attorney's fees. On remand, the trial judge is directed to receive evidence of the attorney's fees and court costs incurred by Seller and to include in its judgment the reasonable attorney's fees and court costs incurred by Seller both at trial and on appeal.

LAWRENCE E. MOONEY, C.J., and CHARLES E. BLACKMAR, Sr. J., Concur.